CHARLES FITCH v. AMERICAN TRUST CO., ADM'R., et al.

Middle Section. May 21, 1926.

Petition for Certiorari denied by Supreme Court January 29, 1927.

1. **Wills. Trial. Court may direct a verdict upholding a will.**
The rule of practice permitting the trial judge to instruct the jury to render a verdict for either party when in his opinion there is no conflict in the evidence contains no exception and a verdict may be properly directed sustaining a will where there is no conflicting evidence.

2. **Trial. Motion for new trial. Peremptory instruction.**

If on motion for new trial the trial court concluded he erred in not directing a verdict, it is his duty to correct the verdict rendered and he may set aside the verdict and direct a verdict, if the evidence justifies it. The office of a motion for new trial is not alone to secure another hearing but to present the errors complained of for correction, if possible, without another hearing.

3. **Estoppel. Wills. Rule of estoppel stated.**

The rule of estoppel to contest a will is founded upon the doctrine of election. One who has received a benefit under a will can not thereafter contest its validity unless he first restore the benefit received.

4. **Estoppel. Wills. Evidence.**

Where the contestant joined with his grandmother in bringing an action against his father to recover certain property and entered into an agreement in settlement of the case with his father, and later sought to break the will of his father which was made at that time, held that there were no acts of estoppel on the part of the son, because he did not cause his father to do any act or take any course upon faith that his son would not after his death, question his sanity.

5. **Wills. Evidence. Evidence held to show testator of mind sufficient to make a will.**

Evidence set out in opinion held to show mental capacity of testator was not below the standard set by decisions of many cases.

6. **Evidence. Wills. Mere opinions of non-expert witnesses are not evidence.**

The mere opinions of non-expert witnesses as to insanity are not evidence; but having stated the appearance, conduct, or conversation of the testator, or other particular fact from which his state of mind may be inferred, they are at liberty to state their inference, conclusion or opinion as the result of those facts. It is the facts which a witness details, the conduct which he describes, which chiefly and primarily constitute the testimony to be relied upon.

7. **Wills. Undue influence. Evidence held not to show undue influence.**

Evidence set out in opinion held not to show testator was under such influence as amounted to coercion, which the testator had no power to resist.

8. **Wills. Undue influence. Party requesting testator to make a will in her behalf not sufficient to show undue influence.**

It does not constitute undue influence that the beneficiary desired the property and communicated that desire to the testator; nor does opportunity to exercise it give rise to a valid inference of undue influence.

Appeal in error from Circuit Court, Davidson County; Hon. W. C. Cherry, Special Judge.

Affirmed.

Charles H. Rutherford, of Nashville, for plaintiff in error.

Bass, Berry & Sims, Elmer D. Davies, and John E. Fisher, of Nashville, for defendants in error.

DeWITT, J. This cause involves the validity of a paper writing purporting to be the last will and testament of Eugene Fitch, who died in Davidson county in May, 1919. The alleged will was executed on August 23, 1909. A trial of the issues before the judge and a jury resulted in a verdict against the validity of the will, and motion for

new trial was made and sustained. The trial judge thereupon granted the motion which had been made by counsel for the proponents of the will at the close of all the testimony and the verdict of the jury was set aside, peremptory instructions sustaining the will were given and the suit was dismissed. A motion was then entered in arrest of judgment on the ground that the trial judge was without power and authority to direct a verdict after the jury had reported their verdict in court and had been discharged from the case and from further service at the pending term of the court. This motion was overruled. Thereupon the contestant, Charles Fitch, prayed and perfected an appeal in the nature of a writ of error to this court and he has assigned numerous errors.

It is first insisted that the trial judge committed error in overruling the motion in arrest of judgment; that motions for peremptory instructions do not lie in cases involving the issues of devisavit vel non; and that the trial judge was without power, after the jury had been discharged to sustain the motion previously made to direct a verdict in favor of either party.

The rule of practice permitting the trial judge to instruct the jury to render a verdict for either party, when in his opinion there is no conflict in the evidence, contains no exception of cases of this character. The principles involved in such practice are the same whatever may be the issues submitted to the jury. When there is no controversy as to any material fact there is nothing for the jury to find and the question is then solely one of law for the court; and in such a case the court may instruct the jury to return a verdict in accordance with his view of the law applicable to such ascertained or uncontroverted facts. Tyrus v. Railroad Co., 114 Tenn., 579, 86 S. W., 1074. This rule is so broad in terms and so clearly applicable to the determination of any issue of fact before a jury, that it does not admit of any exception in favor of an issue of devisavit vel non. Nor was the trial judge without power, after setting aside the verdict, to sustain the motion for peremptory instructions.

In Barnes v. Noel, 131 Tenn., 126, it was held that it is permissible on motion for a new trial for the losing party to question the action of the court in refusing him peremptory instructions; that this is an error that can be remedied by correcting the verdict. The court said:

"If on motion for a new trial the Circuit Judge concludes he erred in directing a verdict, it is his duty to set that verdict aside and award another hearing of the case. If on motion for new trial he concludes he erred in not directing a verdict, under our practice, it would be his duty to enter an order correcting the verdict rendered to conform to the undisputed evidence. The office of a motion for a new trial is not alone to secure another hearing but to present the errors complained of for correction, if possible, without another hearing."

Thus, the practice pursued as complained of is a well-settled practice and is not now open to question.

In giving his reason for so directing a verdict sustaining the will, the trial judge held that there was no substantial disagreement between the witnesses for the contestant and the witnesses for the proponent as to the facts. The grounds of the contest were mental incapacity to make a will and undue influence and fraud exerted and practiced upon the testator by his wife, Mary Fitch, and others, to procure him to give to her all of his property to the exclusion of the contestant, Charles Fitch, his son and only heir. The trial judge also held that Charles Fitch was estopped to question the validity of the will of his father by reason of certain transactions made by him about the time of the execution of the will. It is proper first for us to deal with this question of estoppel.

At the time of the execution of the will, the testator, Eugene Fitch, was of the age of about sixty years. His mother, Mrs. Cozad, had just died at a very advanced age. In 1883, Mrs. Cozad had conveyed to her two sons, Edwin and Eugene Fitch, a tract of 371 acres of land, of which the land herein involved is a part, situated in Davidson county. Edwin Fitch died in 1899, and in his will he devised his one-half interest in this land to Mrs. Cozad, his mother. Sometime thereafter the surviving son, Eugene Fitch, induced his mother to consent to a partition between her and him, and in pursuance thereto deeds were executed by them. Charles Fitch being estranged from his father was living with his grandmother, Mrs. Cozad. Mary Fitch, the then wife of Eugene Fitch, was his step-mother. Early in 1909, Eugene Fitch conveyed to his wife a tract of nineteen acres of land, including the home. In July, 1909, Mrs. Cozad, at the instance of Charles Fitch, the contestant of this will, and with his active aid, filed a bill against Eugene Fitch and his wife to set aside the partition as fraudulent and inequitable and the result of taking undue advantage of Mrs. Cozad on account of her age. She charged her son and his wife with having so schemed, connived and acted throughout the transaction as to take from her all of her valuable interest in the land excepting 126 acres which she had sold to one Anderson for $2100. Charles Fitch filed an intervening petition in said cause, averring that under the will which Mrs. Cozad had executed making him her sole beneficiary, he was substantially interested in the subject-matter of the litigation, and praying that he be permitted to become a party thereto and set up his interest in the subject-matter. Mrs. Cozad died in August, 1909, a few weeks after she had filed her bill, and about the time of the execution of the will in question by Eugene Fitch. On July 26, 1909, just before her death, a decree of compromise was drafted and signed by all the parties to that cause, which decree was entered in October, 1909. Under the terms of this consent decree, which was signed by Eugene, Mary and Charles Fitch, and Mrs.

Cozad, Eugene and Mary Fitch conveyed to Mrs. Cozad an additional tract of 57 acres as an equalization of their interests in the original tract of 371 acres. Charles Fitch acquired this tract of 57 acres by devise from Mrs. Cozad. Thereafter he sold and conveyed to various parties this land which he had acquired by devise from his grandmother, who had acquired it by deed from Eugene Fitch executed about the time he executed the will now involved in this cause. An additional consideration to Mrs. Cozad and Charles Fitch, set forth in the agreement of compromise, was a covenant on the part of Eugene Fitch not to contest the will of Mrs. Cozad. He was her sole surviving child and but for her will, he would have inherited her entire estate. The trial judge was of the opinion that Eugene Fitch could have successfully contested her will on the ground of undue influence and mental incapacity as shown by her own allegations in the bill filed by her; that the amount of metal capacity that the testator had to have to deal with the contestant in these matters was much greater than in making the will. Subsequently, the contestant warranted the title to the property which he acquired under this contract and consent decree. The trial judge was of the opinion that these facts raised a complete estoppel upon the contestant. It is insisted that in so holding he was in error. It is also insisted that the question of estoppel could not be properly considered because neither estoppel nor facts showing an estoppel were set up in the pleadings. But in the view which we take of this case we may pretermit this question of pleading. We are of the opinion that the facts recited do not raise any estoppel upon the contestant. The rule of estoppel to contest a will is founded on the doctrine of election. One who has received a benefit under a will cannot thereafter contest its validity. As a condition precedent to his right to contest he must restore the benefit received. 28 R. C. L. 387. Estoppel is a branch of the law of evidence and has its foundation in fraud, not that there must be intentional fraud, but the person estopped is considered by his admissions, declarations or conduct to have misled another to his prejudice, so that it would work a fraud to allow the true state of facts to be proven. Rogers v. Colville, 145 Tenn., 659, 238 S. W., 80; Bigelow on Estoppel, 437; 10 R. C. L., 691. It is one of the necessary elements of an estoppel that the party pleading it must have been misled to his injury; that is he must have suffered a loss of a substantial character, or have been induced to have altered his position for the worse in some material respect. As otherwise expressed, where no valuable right is parted with and no injury is suffered there can be no estoppel in pais. This rule set forth in 21 C. J., 1135, was expressly approved in Rogers v. Colville, supra. In that case the rule was emphasized that estoppels are not favored in the law. This is for the reason that estoppel precludes a party from asserting the truth or enforcing a right which he is otherwise entitled

to, and therefore, unless by his conduct another's rights have been prejudiced the principle will not be applied. Russell v. Colyar, 4 Heisk., 193; Hume v. Commercial Bank, 9 Lea, 728. In this cause the contestant has not received or accepted any benefit under the will. He made an agreement with his father, about the time of the execution of the will, which was predicated upon his father's capacity to enter into an agreement. This agreement was primarily for the benefit of his grandmother and ultimately for his own benefit. He acquired a tract of 57 acres of land, but he acquired it through the will of his grandmother. In doing so he did not mislead any one to his injury. He did not cause any one to adopt a course of conduct which he would not have adopted had not the agreement been made. The land involved in that agreement is not the land that is involved in this cause. The question of the validity of any will made by Eugene Fitch was not all involved in that transaction. It is true that the contestant indirectly derived a benefit upon an assumption that his father was of sound mind and capable of entering into a contract; but the contestant was not then put to any election whether to accept such benefit or contest the validity of a will which had not been made and of which, of course, he knew nothing.

He did not cause his father to do any act or take any course upon faith that his son would not, after his death, question his sanity. His father did not predicate his agreements upon any covenant, assumption or belief that his own sanity would not be questioned or his own will attacked. The sanity or insanity of the father was not in issue, although he was dealt with by the contestant as if he were of sound mind. Were the son to attack his father's contract and conveyance of the land to his mother, he would be met with a complete estoppel; but the validity of those transactions is not involved in this cause. There is a rule of judicial estoppel—that a litigant who has deliberately taken a position will not be allowed to advantage himself by taking an inconsistent one either in the same or another suit. Johnston v. C. N. O. & T. P. Ry. Co., 146 Tenn., 160, 240 S. W., 429; Stearns Coal & Lumber Co. v Jamestown Rwy. Co., 141 Tenn., 206, 208 S. W., 334. But this rule, so broadly stated, must be considered in the light of the facts of each case to which it is applied. It is a part of the rule that the positions taken must be clearly inconsistent, the same questions must be involved, and the party claiming the estoppel (or, as here, his privies in estate) must have been misled and must have changed his position. 21 C. J., 1230; 10 R. C. L., p. 702. An examination of very many cases upon this subject has disclosed no application of the doctrine of estoppel to a case in which the issues or transactions were so dissimilar to those formerly invoked as ground for the estoppel. In each case in which our Supreme Court has sustained an estoppel because of an inconsistent position taken in a former suit, the same question had been made in the prior proceeding. We do not feel war-

ranted in extending the rule beyond such case. Reliance is made hereby counsel upon Wynne v. Spiers, 7 Humph., 394, for applying an estoppel upon this contestant. In that case the inconsistent positions taken by the contestant of the will of his deceased wife were directly related to each other. She had brought against him a bill for divorce and recovery of property worth about $20,000, which, by a marriage settlement, had been settled upon her for her sole and separate use. Pending said suit a compromise was effected by which the husband conveyed to the trustees of the wife about $8,000 worth of the property, and this in consideration of being permitted to remain absolute owner of the balance of said property, and to be free from the debts of the wife and from all liability to support and maintain the wife. While the suit for divorce was pending and to be proceeded with, she died and her will (authorized to be made, under the compromise) was probated. The divorce suit was revived as to her executor, by consent of the parties, and the agreement of compromise was by like consent made the decree of the court. Subsequently the surviving husband, who had participated in all these proceedings, filed a petition in the county court to contest the validity of the will on an issue devisavit vel non. In reviving the divorce suit as to the executor the husband was the actor. He had an interest to set up the agreement and decree of compromise rather than the marriage settlement. If the latter had been construed to be his succession to his wife's estate upon her intestacy, he would have had to pay, not the fund of $8,000, but the $20,000. Under these facts the Supreme Court held that the form and matter of the decree of compromise were an estoppel against the husband disputing the probate of his wife's will. The husband had recognized the validity of the will. He obtained under the decree the advantage of having to pay $8,000 instead of $20,000. He sought to avoid paying this $8,000 by contesting the will. He could not be allowed to gain $12,000 and relief from obligation of support and avoid the obligation of $8,000 which was the consideration therefor. The same property was involved in both suits. The husband dealt with the executor to the detriment of the estate. He could not be allowed to follow this advantage further as a result of taking an inconsistent course. That case was so different in its essential elements from the case before us that we cannot regard it as controlling this case. For these reasons we must treat this case, as at large.

The question now to be determined is whether or not there was any substantial conflict in the evidence requiring the submission of the case to the jury; and if not, did the evidence warrant the trial judge in granting the motion for peremptory instructions and sustaining the will? In considering this motion for peremptory instructions, we must take that view of the evidence which is most favorable to the party complaining, and if there is any doubt as to the conclusion to be drawn from the whole evidence, the motion should have

been denied. Mayor and City Council v. Reese, 138 Tenn., 479, 197 S. W., 492. If the evidence is conflicting on material points, or diverse inferences can be drawn from the evidence not conflicting, the question cannot be decided by the court, but must go to the jury. Likewise the evidence must be looked to as a whole, and all reasonable inferences drawn from it favorable to the contestant. Western Union Tel. Co. v. Lamb, 140 Tenn., 111, 203 S. W., 752; King v. Cox, 126 Tenn., 553 151 S. W., 58; Railroad v. House, 96 Tenn., 552, 35 S. W., 561; Rwy. Co. v. Morgan, 132 Tenn., 1, 175 S. W., 1148. But, as was said in Noble v. C. Crane & Co., 169 Fed. Rep., 59;

> "It is the duty of the court to direct a verdict unless the conflict is positive. The conflict must be real not merely apparent. The mere dogmatic assertion, which does not appeal to the reason of the court, which does not have substance and relevant consequence, which does not have fitness to induce conviction is not proof, even if uncontradicted, and does not interfere with the duty of the court to direct a verdict."

Counsel have to some extent discussed the weight of the evidence adduced at the trial. The appellate court can only determine whether or not there is testimony directly asserting unsoundness of mind or undue influence. If there is such testimony these issues were wholly within the province of the jury. Kirkland v. Calhoun, 147 Tenn., 397, 248 S. W., 302; Tyrus v. Railroad, supra.

The law fixes the standard of mental capacity but cannot describe undue influence with precision. The will must be the voluntary act of a capable testator. The testator must be of sound and disposing mind and memory. His mind and memory must be sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed his will. Pritchard on Wills, sec. 99. But, if otherwise capable, he be induced by undue influence controlling or destroying his free agency by force or the stronger will of another, the instrument is not the will of the testator but that of another. Pritchard on Wills, sec. 121. One is not rendered incapable of making a will by mere physical weakness or diseases, old age, eccentricities, blunt perceptions, weakening judgment, failing mind or memory, or addiction to the use of intoxicating liquors; in other words, these are not necessarily inconsistent with testamentary capacity. The mind may be sound, although the understanding or mental capacity may be weak. A person may be capable of disposing by will and yet not capable of making a contract or managing his estate. Pritchard on Wills, sec. 100; Smith v. Harrison, 49 Tenn., 23; Nailing v. Nailing, 34 Tenn., 630; State ex rel. v. Goodman, 133 Tenn., 375, 181 S. W., 312.

To avoid the will on either of these grounds the evidence must be directed to the very time and act of making the will. The fact that the testator was under the general and even controlling influence of another person in the conduct of his affairs will not ordinarily suffice

to invalidate the will, unless that influence was specifically exerted upon the testamentary act, and did to some extent mislead him to make a will essentially contrary to his duty or inclination but where such general and controlling influence is shown to exist and there is constant opportunity for its exercise, and the will is unduly favorable to the person possessing such influence, the inference is strong that the influence was directly used to procure the will. Pritchard on Wills, sec. 129; Simerly v. Hurley, 9 Lea, 711; Smith v. Harrison, 2 Heisk., 230. On the other hand, the use of fair argument or persuasion, appeals to the affection, attachment and sense of duty and obligation, accompanied by honest intercession and persuasion, will not, in the absence of fraud or deceit, vitiate the execution of a will where the testator is of competent, sound mind. It has been held that the will of a testator of unquestioned capacity cannot be destroyed by proof that the beneficiary subjected him to persistent and irritating importunities, it appearing that the will was drawn up from the testator's dictation, in the absence of the beneficiary and executed by him in the presence only of the scrivener and the witnesses selected by the testator. Undue influence to avoid the will must be of an irresistible character, considering the mental and physical condition of the testator, and must be exerted over the very act of devising so as to prevent the will from being the act of the testator. Pritchard on Wills, sec., 129-130-131; McClure v. McClure, 86 Tenn., 173, 6 S. W., 44; Smith v. Harrison, Nailing v. Nailing, supra. These rules so well settled, furnish the standard for determination whether or not the evidence, with all legitimate inferences therefrom, justifies the submission of the issues to the jury. A number of ordinary, non-expert witnesses testified for the contestant. Of course, their mere opinions, apart from the facts, upon which they are based, are not evidence. Only when they have stated the appearance, conduct or conversation of the testator, or other particular fact from which his state of mind may be impaired, they are at liberty to state their inference, conclusions or opinion as the result of those facts. Gibson v. Gibson, 9 Yerg., 332, 22 C. J., 126.

We will first review the testimony of these witnesses.

B. F. Bixler, an old man and neighbor, testified that the testator's mind was very much weakened by the constant use of liquors; but that he thought the testator was capable of knowing and appreciating what he was doing when he was not drunk. He would not consider it safe to have an important business transaction with the testator alone, lest his wife would undertake to upset it. He thought that anybody who drank liquor excessively was a fool. He admitted that the testator was sober at times. In 1909 he purchased from the testator and his wife a tract of land and accepted their deed. He also attested the deed of the testator to his wife of the tract of 19 acres of land, including his residence.

Joe Whitworth, an old negro who was employed by the testator, testified that once he heard a conversation between the testator and his wife when the testator was drunk. The testator's wife was asking him to will her his property and with some oaths he said that he had nothing and would not do it. The only date fixed for this conversation was before prohibition of the liquor traffic became effective. The date is very indefinite. He said that at other times he heard about the same conversation between them. He testified that when the testator was "clear of whiskey pretty well he waren't no fool."

H. B. Chadwell, a neighbor, formerly a magistrate, testified that he knew the testator for forty years; that he was drunk or half sober all the time in his judgment; that he was worse sober than drunk, because he was bothered to death about trying to get a drink. He purchased several tracts of land from the testator, some of them about the time of the execution of the will. His opinion was that in the summer or fall of 1909, he was of unsound mind and not competent to transact any important business by himself. He based this opinion upon the fact that it was not natural for a man to will his property away from his own flesh and blood, although to his wife, and upon what he observed about him. On cross-examination, he qualified his opinion by declaring, "I don't say his mind was unsound or that he was an imbecile . . . he didn't trust himself. He would always ask this wife of his to assist him in the transaction of business. He further said he could not say just what he saw in him that was the basis of his opinion, but he was a man whom one would not trust with his business, and a man of that kind he would not think would be a capable man.

H. E. Waller testified that he had a good opportunity to observe the testator and that he never did think he was of sound mind at all times; that in trading with the testator he was flighty, not dependable. The trading consisted of buying produce and live stock involving small amounts, and the testator knew what he was selling and what he was receiving for it. His description of an unsound mind and its meaning was a man who is not really capable of looking after his own business; he said the testator could go around town, take care of himself but was "harem-scarem." He could not definitely state the time of his transactions with the testator.

The contestant, Charles Fitch, testified that his father was an incessant drinker of liquor, especially in the year, 1909, and prior thereto; that during that year he was drunk all the time. He admitted that upon a former trial of this case he had testified that his father was perfectly normal up to the time of his death and had as good sense as anybody; but he said that he did not understand the questions. He said that he meant that his father had silly ways due to intoxication. He finally admitted that his father was not drunk all the time.

George Carlisle, a member of the Fire Department of Nashville, testified that in 1897, he became acquainted with the testator, spending some time in his home; that the testator drank whiskey to an excess. He said that he never did consider that he had a great deal of sense to start with and that he did not think that he was capable of knowing or appreciating the quality of his acts, or important transactions; that he could not qualify as an expert as to mental soundness, but that the testator did not impress him as being a man of unsound mind. He said that the testator was never sober when he saw him. He did not state fact or circumstance other than drunkenness as a basis for his opinion.

C. M. Dickinson, a neighbor, testified that he had many transactions with the testator; that he always had to make a trade with the testator's wife as well as with him; that she was the dominating spirit; that the testator spent two thirds of his time in the city drinking whiskey if he could get it, and was nearly all the time under the influence of liquor. These were the facts upon which he based his opinion, "I don't think his mind was so good, he didn't seem to have the knowledge that he should have had." He didn't fix any dates definitely or approximately with reference to the basis of his opinion. He did narrate one or two acts of the testator while he was drunk, among them was having a quack doctor on the Public Square pull his tooth.

Frank Stull, without setting forth any facts other than that the testator's wife seem to be the dominating spirit and controlled his transactions, testified that from his acquaintance with the testator his observation of him and conversations with him, he did not think he was capable of knowing and appreciating the quality of his acts. He said that he thought he had seen him sober. He saw the testator purchase an old gray mare at about four times as much as she was worth. He does not fix any dates.

John E. Binns, testified for fifteen years he saw the testator once or twice a week; that he never did consider him a smart man; that he did not know whether or not he had a sound mind; that he would not think he was capable of fully appreciating and knowing the quality of his acts about important business.

J. M. Lanier testified that he knew the testator from 1886 to his death; lived near him and had many conversations with him; had traded with him and been around him and "he was not right." He purchased two tracts of land from the testator. He said that from his conversations and transactions with the testator, the thought that his mind was bad in 1909 and he did not know the value of anything at that time. He had seen him sober many times. He admitted that when the testator signed the deeds conveying the tracts of land to him he knew that he was selling his land to him and how much he was

selling. He bought a tract from him in May, 1909, another tract in January, 1910, another in April, 1910, and another in January, 1916.

Lee Sanders, a city detective, testified that he thought that he knew the testator in the summer and fall of 1909; but he first said that he first met the testator about ten or twelve years ago and that would be at the furthest some four to six years after the execution of the will in question. At one time, the date not given, he refused to buy a load of cedar posts from the testator because he did not feel sure that he knew what he was doing. He testified that the testator was frequently drunk; seemed a sort of nervous wreck, and hardly responsible for his actions; at one time, early in the morning, the testator jumped out from behind a telephone post and caught him around the neck. Finally, when asked his opinion, he said that he did not think that he was a man of very strong mind; he always acted silly. He seemed to have a weak mind. He had seen him sober, but his knowledge of him was mostly when he was drunk.

Will Franklin, colored, who at sometime in 1918 or prior thereto, was a farm hand on the testator's farm, testified that the testator's wife always attended to any trades or business transactions with him; that he was drunk much of the time; that from his observations of him and conversations with him, trading and dealing with him generally, he considered him of unsound mind. When asked if the testator did not know what he was doing and what he was about, he said he did not at all times; he would act queerly and do silly things; that on one Sunday when he didn't seem to be drunk he threw his hat down and ran out and hailed every automobile that came by until he got one to take him to town. That was about 1913 or thereafter. He did not testify that he knew the testator in 1909.

Wash Stone, who knew the testator for many years, testified that from his conversations with him, he did not think he was of sound mind; that he did not think that he was capable of knowing and appreciating the nature and quality of his acts. He thought that for thirty-five years the testator was of unsound mind.

Peter Brooks, colored, who worked for the testator twenty years or more ago, testified that he drank a great deal of whiskey; that he got to the place where they had to confine him or restrain him so that he could not get liquor; but he said that this latter condition was during his last days, which was nearly ten years after he executed the will. He said that he did not trade with him because his wife would over-rule him in a trade; that if one made a trade with him he would "give back and let her word go and you would lose." He said that in his last days he was not of sound mind but he did not know what was the condition of his mind in 1909.

G. W. Gullett, who in 1909 knew the testator and had occasion to observe him but not often, testified that he had seen him drunk in town and his wife having to carry him home; that his wife attended

to business transactions for him. When asked, from his observations and dealing with him and from his conversations, did he consider him a man of sound or unsound mind—he answered:

"Well, it is kind of a hard proposition but so far as my part was concerned I could not think a man drinking as much as he drank could have a very sound mind."

Mrs. C. M. Dickinson testified that at a very early date Mr. and Mrs. Fitch came to her home where she had other visitors and they were introduced to each other; that later the testator left the room, called her out and was very much offended and asked her why she did not introduce him to the visitors, so she introduced them again. Before a great while he had forgotten it and he called her again and was offended because she had not introduced her to the other guests in the house. She admitted on cross-examination that later on when they found out he was a drinking man they might have attributed this conduct to drinking, but at that time they did not know of it. She did not express any opinion as to his mental capacity.

George Carlisle being recalled testified that while he was staying at the home of the testator, which was in 1897, twelve years before the execution of the will, Mrs. Fitch asked him to intercede in her behalf to have her husband devise his home place to her on the ground that his son, Charles Fitch, had already been provided for; that he heard her trying to persuade her husband to will the place to her, and that with an oath he told her that she wanted all her people to get everything and his to get nothing. He said the same thing to the witness. He said that upon the two occasions when this occurred both Mr. and Mrs. Fitch were drunk.

C. M. Dickinson, being recalled, testified that in 1907 or 1908 the testator told him that he was going to convey the house and some ground to his wife so as to take care of her and the balance of his property he was going to give to the contestant, Charles Fitch.

R. K. Camp, who lived about two miles from the testator and saw him nearly every day, testified that he had many conversations and some little transactions with him; that on one occasion he was trying to buy some cows from him and his wife told him in the presence of the testator that the price would have to suit her; that she overruled her husband in the trade; that this occurred about ten or fifteen years ago, which would be not earlier than 1910. He said that the last of a week he was not really competent to attend to his business; that he would make a proposition and the other party could not count on him to take it up on Monday morning or Saturday; that he was very forgetful but he would be under the influence of liquor. He said as far as he knew the testator when sober knew pretty well what he was doing and saying, "but more or less he would vary from it and make it different;" that he was incompetent the last of a week because he drank too much. When asked to state from his conversa-

tions and transactions with the testator during the period of eight or ten years before his death, whether or not he was of sound mind, he stated that he would think that he was of unsound mind; that he was not capable of attending to any real business. On cross-examination, he admitted that his testimony referred to a time about three or four years before the death of the testator. He also admitted that when the testator was sober he talked as if he knew what he was doing.

Amos Cole, colored, testified that he had many transactions and conversations with the testator; that the testator talked to him about his home affairs, showed him the boundaries of his lands, told him that he was not happy in his home, that in recent years he began to drink heavily; that he did not think that sometimes the testator had right good sense whether he was drunk or sober. He did not say with reference to any particular time. He said that he based his opinion as to the testator's mental condition upon the fact that he did not transact business, that a man has "got to run his own farm" and if he does he has a sound mind.

F. B. Anderson testified that he knew the testator the year 1909 and prior thereto; that he drank hard during that time; that from his conversations with him and his general observation of him he considered him of unsound mind.

Two physicians testified as expert alienists.

Dr. Lentz testified that from his observation and experience, men became insane from the continued drinking of intoxicating liquors; that this is one of the causes of insanity given in the medical books; that he had seen a number of cases of alcoholic dementia; that this is manifested at times in an excitable state but most often one of depression physically and mentally; that he had frequently seen such persons with hallucinations or delusions; that when a man loses interest in everything but finding whiskey, or drinking whiskey, or getting more, he would be considered a confirmed addict with psychosis. That is an impaired condition of the brain. He said that this may not destroy the mental power completely but impairs it.

Dr. J. W. Stevens testified that continued use of whiskey or alcohol is liable to affect one's mental condition; that continuing under the influence of liquor all the time, though not necessarily intoxicated, would bring about a state of both physical and mental deterioration; that this would show itself in a general state of unreliableness, impairment of memory, feeling that one is not getting a square deal, carelessness, irritableness, disposition to be "fussy," tendency to blame one's troubles and shortcomings on members of his family. When asked a hypothetical question purporting to be based on many of the facts testified to, Dr. Stevens said that he would not like to say whether such a man was definitely of sound or unsound mind, but the man described in the hypothetical question would be what he conceived to be a chronic alcoholic with the weakness and deterioration

that goes with chronic alcoholism. He said very probably such a man was not capable of appreciating the quality of his acts. On cross-examination he said that such men in lucid intervals are thoroughly capable of appreciating their acts; that yet he doubted if any man who drinks to excess and at frequent intervals, gets on hard sprees over a long period of years is entirely a normal man; that the use of alcohol may bring about acute insanity, or delirium tremens, or it may be more gradual in its impairment of a man's faculties, "takes the edge off his mind as it were, dull it."

There is no testimony that the testator was drunk at the time of the execution of the will. The will was written at the request of the testator by Mr. Preston Vaughn of the Nashville Bar and was witnessed by Mr. W. P. Cooper and Mr. Lewis Tillman, also members of the Nashville Bar. It was written and executed in the office of Mr. Vaughn in the city of Nashville and the testator's wife was not present and had no conversation with Mr. Vaughn with reference to the will. Mr. Vaughn testified that the testator was sober. The attesting witnesses testified they had no independent recollection of the matter except that the testator signed the will in their presence. Mr. Tillman testified that if there had been anything that was not normal in the appearance or conduct of the testator he would have noticed it and he did not remember anything of that kind.

The will was made during a period of estrangement between the testator and his son, the contestant. The contestant had but very recently joined with his grandmother in charging the testator with having defrauded his aged mother. The contestant was and is an unmarried man and has himself been addicted to the use of intoxicating liquors. He had no business ability and was a spendthrift. The reasonableness or unreasonableness of a will may be looked to as a circumstance in determining mental capacity but this will made under the circumstances certainly contains no evidence of mental incapacity. It is not so contrary to natural justice as to raise any inference that it was contrary to the desire of the testator. The preference shown to the wife under such circumstances, even to the exclusion of the son, would not be any reason for impeaching the will. McClure v. McClure, 86 Tenn., 177, 6 S. W., 44.

The mere opinions of non-expert witnesses are not evidence; but having stated the appearance, conduct, or conversation of the testator, or other particular fact from which his state of mind may be inferred, they are at liberty to state their inference, conclusion or opinion as the result of those facts. It is the facts which a witness details, the conduct which he described, which chiefly and primarily constitute the testimony to be relied upon. Gibson v. Gibson, 9 Yerg., 333. This rule relates to testimony as to insanity. The admission of such testimony is based upon the statement of facts inconsistent with sanity. If the non-expert witness does not testify to such facts, his

mere general conclusion is not evidence, and is entitled to no weight. Lowe v. Williamson, 2 N. J. Eq., —; In re Walters Estate, 215 Mich., 572, 184 N. W., 529.

It is for the trial court to .say whether a non-expert witness has testified to any facts which justify him in expressing an opinion that testator was insane. Murray v. Noon, 219 Mich., 70, 188 N. W., 381.

Where the facts are not sufficient in the opinion of the court to give a reasonable basis for an inference, or sufficient admissible facts are not clearly stated, the witness is incompetent, or his evidence is entitled to little, if any, weight. 22 C. J., 608, and cases there cited.

A careful appraisement of the testimony shows that it is insufficient to show mental incapacity at the time of execution of the will. The burden was on the contestant to show this by clear and satisfactory evidence. Much of this testimony relates to times remotely prior or subsequent to the date of execution of the will. Certain of the witnesses give their opinions without furnishing any facts as a basis therefor. Certain others give facts which are insufficient as supporting any conclusion of mental incapacity. They relate to mere feebleness of intellect, not amounting to imbecility, or to mere loss of memory at a time remote from and concerning things other than the making of a will; or to mere eccentricities, or weakened judgment. They do not tend to show such mental unsoundness as to incapacitate a person to dispose of his property by will. Certain of the witnesses purchased land from the testator about the time the will was executed. They thereby admitted his ability to make a contract. They thus destroyed all the value which their opinions would have had. The proof is uncontradicted that the testator was sober at the making of the will. Altough he had been addicted heavily to' drinking intoxicating liquors,· there is no evidence that the will was not executed during a lucid interval. The effect of drunkenness upon testamentary capacity was ably discussed in the case of State ex rel. v. Goodman, 133 Tenn., 375, 181 S. W., 312. A careful analysis of the opinion of Mr. Justice Buchanan in that case reveals the holding that when a man executes a will·that is natural under the circumstances and it does not appear that he was under the influence of liquor at the time of the execution of the will, so as not to understand what he was doing, and it further does not appear that he was afflicted with mental disease due to the habit, he is not to be deemed incapable of executing a will.

In Nailing v. Nailing, 2 Sneed, 630, it was held:

"A man may freely make his testament how old soever he may be, for it is not the integrity of the ·body, but the mind that is requisite in testaments. Swinb. Part II, sec. 5. The law looks only to the competency of the understanding; and neither age, nor sickness, nor extreme distress, nor debility of body will affect the capacity to make a will if sufficient intelligence remains. Van

Alst v. Hunter, 5 Johns. Chan., 148. The will itself contains intrinsic evidence in its favor; it is a reasonable and natural will.''

It will be noticed that the opinions of all these witnesses as to mental unsoundness are so qualified by expressions of doubt that they are not at all positive and as aforesaid they are not based on any facts or circumstances, which show insufficient capacity to execute a will.

The opinions of the expert witnesses do not really go to mental unsoundness. They were asked hypothetical questions and they did not say whether or not the subject of the questions was of sound mind. They were asked many questions as to the effect of the constant use of alcoholic liquor upon the brain. They went no further than to say that the mind might become impaired therefrom; but such impairment did not go to the extent of destroying the ability to know and understand the business in which the person was engaged.

We have sought to test this evidence by the standard of mental capacity fixed by many decisions and no longer open to question. The evidence adduced by the contestant did not show the capacity of the testator to be below the standard.

Nor is there any evidence that the will was executed through exertion by the wife of any moral force amounting to coercion which the testator in a spirit of submission had no power to resist. Nailing v. Nailing, supra. The fact that the wife, Mrs. Mary Fitch, for many years insisted on making the trades and exercising final judgment as to business matters, is too remote and irrelevant as bearing upon the question of undue influence. The fact that she repeatedly requested her husband to devise his property to her is not evidence that the will was executed through such undue influence. It does not constitute undue influence that the beneficiary desired the property and communicated that desire to the testator; nor does opportunity to exercise it give rise to a valid inference of undue influence. The testator's wife was not present at the making of the will. Of course, this would not be conclusive. She had no communication with the lawyer who drafted the will with respect to the provisions of the will. The son had just alienated his father and had derived from his grandmother the title to about sixty acres of land. The evidence shows that whenever Mrs. Fitch was heard to importune her husband to devise his land to her, he declined to do it. There is no evidence that even these conversations took place at any time near to the date of making the will.

Upon the whole, we are of the opinion that the trial judge was correct in granting a new trial and sustaining the motion for peremptory instructions in favor of the validity of the will. The judgment of the circuit court is therefore, affirmed. The costs of the appeal will be adjudged against the contestant.

Faw, P. J., and Crownover, J., concur.