ROGERS et al. v. HICKAM et al. No. 1.—208 S. W. (2d) 34.

Eastern Section. March 18, 1947.

Petition for Certiorari denied by Supreme Court, August 1, 1947.

John R. Todd, Jr., Thos. A. Dodson, Sr., and Thos. A. Dodson, Jr., all of Kingsport, for plaintiffs in error. James Phillips, Jr., of Rogersville, for defendants in error.

FOWLER, SPECIAL JUDGE. This is a will contest. The alleged testator was C. P. Rogers, a resident

of Hawkins county, Tennessee, who died October 28, 1945, at the age of seventy-eight years.

Mr. Rogers' first wife died in 1907. They had seven children, of whom two predeceased the testator and left no issue. Another child had died before the testator leaving three children surviving, namely, C. M. Reasor, Imogene Reasor and Mary Reasor, who, together with the four surviving children of the testator, Mrs. Willie L. Hickam, Mrs. Laura Burchette, Mrs. Frankie Winegar and Mrs. Maude Legg, are the contestants.

The proponents are Minnie R. Rogers, who was the second wife and is the widow of C. P. Rogers, and Bessie Rogers Miner, their daughter.

The grounds of contest are incompetency and undue influence. There was a verdict and judgment in the Circuit Court against the will, and the proponents have appealed.

The will was executed on October 20, 1945, eight days before the death of C. P. Rogers. It reads as follows:

"Last Will and Testament

"I, C. P. Rogers of Hawkins County, Tennessee, being of sound mind and disposing memory, mindful of the uncertainty of life and the certainty of death and desiring to make such dispositions of my worldly estate as I deem best, do hereby make, publish and declare this to be my last will and testament, hereby revoking any and all former wills and codicils whatsoever by me heretofore made.

"First—I direct that, all of my just debts and funeral expenses be paid out of my estate as soon after my decease as conveniently may be and to that end charge my whole estate both personal and real.

"Second—I give, devise and bequeath to my wife, Minnie Rogers, for her natural life, all of my farm lands in Hawkins County, Tennessee, and on which I now live, together with farming tools, implements, crops, live stock, monies, notes and choses in action, and all other personal property, of every kind and character, whereso-ever located, and on the death of my wife, Minnie Rogers, this devise and bequest is to go to my daughter, Bessie Rogers, Minor, to be hers absolute and in fee simple forever to do with as she sees fit.

"In Witness Whereof, I have hereunto set my hand and seal to this my last will and testament, at my home in Hawkins County, Tennessee, this the 20th day of October, 1945.

"C. P. Rogers (x) His Mark.

"Witness

"E. A. Cope, Rogersville, Tennessee

"Signed, sealed, published and declared by said C. P. Rogers as and for his last will and testament, in the presence of us, who in his presence, at his request and in the presence of each other, all present together, have hereunto subscribed our names as witnesses to this said will, the 20th day of October, 1945.

"Bert Hawkins

"Carson Perry"

The will had been typewritten under the directions of an attorney and was signed by Mr. Rogers by his mark, as indicated. The estate involved is said to consist of a farm having a value of $20,000.

Until C. P. Rogers suffered a stroke several years before his death he had been an active, educated man. The record shows that early in life he had been engaged in the operation of a store and thereafter had managed

real estate, which he owned, which at times included several houses and for some years prior to his death had consisted of a farm which he had actively managed. He was considered a man of sound intelligence and judgment.

The evidence relied upon by the contestants as requiring the case to go to the jury upon the issues is summarized as follows:

There is no specific testimony as to the actual date of the stroke suffered by Mr. Rogers other than that it occurred several years before his death, nor is there specific testimony as to the gravity of his illness at that time. The record leaves one to surmise as to these things in the light of the descriptions of his condition and conduct since that illness, as supplied by various witnesses. All witnesses agree that Mr. Rogers suffered a permanent paralysis to such an extent that his power of speech was almost completely lost, and that he was unable to convert his vocal sounds into speech understandable to strangers or to persons who did not live with him; and it is uncontroverted that the paralysis affected his right arm to the extent that he lost the ability to write and sign his name. The arm appears to have been rendered quite useless. He largely retained the powers of locomotion, the record showing that he engaged in rather extensive walks.

Many witnesses testified that after the stroke Mr. Rogers couldn't talk so that one could understand him, and many witnesses said that sometimes they could understand him and sometimes he would make himself understood by demonstrating what he meant.

The witness Perry stated that after the stroke Mr. Rogers sometimes would walk to the witness' house, which was in the neighborhood, and stay there, and then

his people would come and talk to him and sometimes he would go back with them and sometimes he would stay until he took a notion to go back himself; that on one occasion Mr. Rogers disappeared in town (Rogersville) after climbing into the back seat of the witness' car as an uninvited guest on a trip into town; and many times Mr. Rogers came around where the witness and others were working.

The contestant Mrs. Hickam testified that after her father had had this stroke she went to see him in 1942, that he was resting on a bed and didn't recognize her or her son or her brother-in-law; that he stared and said, "Ah, Ah" and would look wild; that she stayed two or three hours but he never did recognize any of them; that she tried to converse with him, that he mumbled now and then and she could make out a word now and then. About thirteen or fourteen months before his death Mrs. Hickam again visited her father and she says that then he was in worse condition, had fallen off, was thin, and that he didn't recognize her or her daughter and that she couldn't understand him when he tried to talk.

The witness Hal Winegar, a son-in-law of Mr. Rogers', testified to the same visit in 1942, first referred to by Mrs. Hickam, saying that Mr. Rogers lay on a cot in his home and didn't recognize the witness or the others; that his talk was unintelligible; that he couldn't raise himself up, that he had a wild and glassy look in his eyes and made a noise sounding something like "Ah".

The witness Jim Vaughn testified that after the stroke Mr. Rogers would sometimes come to his house and the witness would put him to bed "when it seemed like he couldn't hardly walk or talk"; that Mr. Rogers got so that the witness couldn't understand what he said; that

the witness helped Mrs. Rogers and her daughter, Bessie Miner, look for Mr. Rogers one day when they couldn't find him, even going to Kingsport to look for him; that after the stroke Mr. Rogers "wasn't able to do anything", that he "was not right, he was off all the way around, his mind was off, his health was off, that is what I mean, his general health . . . his mind was not right, unsound".

The witness F. T. Robinette testified that Rogers, after he had had the stroke, didn't appear like he had beforehand and didn't seem like he was beforehand in a business line.

The witness George Robinette stated that after the stroke Mr. Rogers came to the witness' house one time at midnight with his face muddy and stayed all night without an explanation and that sometimes the witness would take Mr. Rogers home and sometimes Mrs. Rogers or Bessie would come after him.

The witness Price said that after the stroke Mr. Rogers couldn't talk very plain and looked a little wild, he didn't act as though he had a sound mind, "I didn't think his mind was well".

The witness Bledsoe tells of an occasion when he helped Bessie Miner find her father, Mr. Rogers, in town and Mr. Rogers refused to go home.

The witness Beal testified that Rogers was not as normal and was not as sound as he was before the stroke.

The witness Horne testified that he was going along the road one day in his car and picked up Mr. Rogers who had a bag on a stick across his shoulder and mumbled something about "Virginia"; that the bag contained only several pairs of shoes; that he took Mr. Rogers home, and that "he was not of the same mental capacity

as before." This was three years before the execution of the will.

The witness Armstrong testified that after the stroke Mr. Rogers couldn't talk clearly; that he would jump to unrelated subjects; that his face was somewhat contorted, and that his mind apparently was unsound.

The witness Davenport testified that in January (presumably in 1945) he went to see Mr. Rogers about renting from him; that he was in pretty bad shape; that he was of unsound mind; that his eyes would glare as if he were frightened.

The above sufficiently indicates the nature of the testimony relied upon by the contestants upon the issue of competency.

We do not find the combination of these circumstances to be as indicative of incompetency as the facts presented in Fitch v. American Trust Company, 4 Tenn. App. 87, 88, where a directed verdict in favor of a will was upheld.

The testator's vocal impediment and loss of use of his writing had to a considerable extent deprived him of the power to communicate with others, particularly such persons as did not live with him and were unfamiliar with his peculiarities of speech. The mere fact of these psysical impediments would not of itself be evidence of mental incompetency . It is said on behalf of the contestants that the testator could not explain his one and one-half mile walk at midnight to a neighbor's house, his walking at noon, two miles from home, along the highway in Hawkins County with Virginia (where he formerly lived) as his destination, and his other absences from home for periods of hours. It is more reasonable to conclude that the lack of explanation was due to his inability to explain, either orally or in writing, these somewhat un-

usual occurrences than to conclude that he was mentally incompetent. He was gripped by an irking incapacity that he couldn't shake off, however hard he struggled, making strange noises in the effort. Sane men have done things such as he did and, being able to explain them, their sanity has never been challenged. He was unable to say, "I thought the bag contained clothing, and I had no idea there were only shoes in it", or, "I preferred walking along the road until the bus came, rather than just waiting for it—maybe somebody would give me a ride". He is said to have had a wild look in his eyes on several occasions. That should not be greatly surprising in a man, theretofore active and vocal, who was laboring under an inability to express himself.

The medical evidence offered was not material evidence of unsoundness of mind. While saying, in answer to a hypothetical question, that "I would judge that person to be of unsound mind", the witness Dr. Henderson explained that a person of advanced age who has a stroke has hardening of the arteries with a consequent lessening of the blood supply to the brain, with "some atrophy of the brain", that a deviation from a normal pattern "is certainly abnormal, and if a man had a cerebral softening, that man's brain is not normal and if it is not normal, it has to be unsound, regardless of what his business transactions would be, regardless of how he spoke to his neighbors". Even though to the medical mind unsoundness may be defined as non-normality, it is not so defined in law in respect to capacity to make a will.

■ "One is not rendered incapable of making a will by mere physical weakness or diseases, old age, eccentricities, blunt perceptions, weakening judgment, failing mind or memory, or addiction to the use of intoxicat-

ing liquors; in other words, these are not necessarily inconsistent with testamentary capacity.'' Fitch v. American Trust Company, 4 Tenn. App. 87, 94.

This case parallels Fitch v. American Trust Company, supra, except that here the disability resulted from a stroke with ensuing partial paralysis while there the testator was an alcoholic. Absent medical testimony that a stroke permanently unsettles the mind, the Fitch case is controlling. Such testimony would have to be particularly convincing, because many people suffer from hardening of the arteries, and from single or multiple strokes, without becoming of unsound mind—a fact of everyday knowledge which the Court cannot disregard.

We conclude that there was no material evidence of unsoundness of mind at any time. Certainly a reading of the record in this case does not make the contention of unsoundness of mind appeal to the reason of the Court, nor does the evidence relied upon by the contestants have substance and relevant consequence, nor does it have fitness to induce conviction. Prudential Insurance Company of America v. Davis, 18 Tenn. App. 413, 78 S. W. (2d) 358, 368.

We further conclude that, even if there be in this record material evidence of unsoundness of mind, it related to a time or times substantially (by at least nine months) preceding the date of execution of the will, and the proponents have overcome the presumption that the unsoundness of mind, if there ever was any, existed at the date of the execution of the will, by introducing uncontroverted evidence of competency on that occasion.

In this respect the witness Cope, who was also a witness to the testator's signature on the will, testified that he read the will in Mr. Rogers' presence and that Rogers

indicated by his head that he knew he was making a will and reached and touched the pen when asked to make his mark. Another witness to the will, Carson Perry, was present and heard Cope read the will to Mr. Rogers, whereupon Cope asked the testator if that was the way he wanted it fixed up and he said yes, and that he was able to understand what Mr. Rogers said on this occasion.

Mrs. Rogers testified that the will was drawn by an attorney at the insistence of her husband and in conformity with his wishes, that after it was prepared she gave it to Mr. Rogers and he read and re-read it several times and asked her to call the attorney to come down, that the attorney came and Mr. Rogers knew him, calling him by his first name, that the attorney read over the will to Mr. Rogers, that shortly thereafter upon the occasion of the actual execution of the will Mr. Cope read it to the testator, and that the testator answered the questions put to him with respect to his will. In other respects her testimony confirms the fact that the stroke of paralysis, suffered long before, had paralyzed his right arm and side and impaired his speech, but he was up and about most of the time and would go places as he had before the stroke, but did not have his former strength, which gave her such concern that she tried to keep track of his whereabouts so that she could take care of him if he should become ill.

The witness Bessie Miner, like Mrs. Rogers a beneficiary of the will, testified that her father frequently said that he wanted to make a will and the will in controversy was drawn according to his directions, was given to him and he read it many times, that during the time preceding

the execution of the will he read the newspapers and would point out articles in the papers.

When recalled, the witness Perry testified that he didn't see anything about Mr. Rogers to indicate that anything was wrong with his mind at the time he executed the will; that he knew people and talked to them, and his mind seemed to be alright on this occasion.

Bert Hawkins, another witness to the will, testified when recalled that he talked to Mr. Rogers upon the occasion of the execution of the will, asking him if he knew the witness, and Mr. Rogers said yes; that he asked Mr. Rogers "Is this your real intention, this will?" Mr. Rogers said yes. The witness testified that Mr. Rogers knew what he was doing on that occasion. Testimony to the like effect was given by Mrs. Georgia Tyler, who was there when the will was executed.

Inasmuch as the record contains no testimony tending to establish incompetency at any time close to the time of the execution of the will, and does contain material evidence of competency at the time of execution, we are of the opinion that a verdict should have been directed in favor of the will.

It is contended by the contestants that the will was unnatural in that Mr. Rogers gave nothing to the children or grandchildren resulting from his first marriage. This necessitates a short review of the domestic circumstances.

At the time of the death of the testator's first wife in 1907 his oldest daughter, Willie, now Mrs. Hickam, was thirteen years of age. She appears largely to have taken over the direction of the home upon her mother's death and conducted it until her father's second marriage, to the present Mrs. Rogers, in January 1914. The

daughter Laura, now Mrs. Burchette, appears to have married and left home shortly before the father's remarriage. In April 1914, Willie herself married and took her youngest sister, now Mrs. Legg, with her when she left at that time, and reared and educated this sister. Another daughter, Frankie, now Mrs. Winegar, is said to have married in 1920 but the record is silent as to whether or not she spent her girlhood from 1914 to 1920 in her father's house. The record likewise contains no information as to where Mrs. Reasor, the deceased mother of three of the contestants, was reared.

The testator's second wife, Mrs. Minnie R. Rogers, was 19 years old, and he was 47, at the time of their marriage in 1914. They had one child, Bessie Rogers Miner, who was 19 years old at the time of the trial in March, 1946. This second wife, now the widow of the testator, appears to have performed adequately her functions as spouse, and she and the testator lived together for 31 years of his life without any hint of estrangement. There is evidence, however, that it was difficult for the second wife to get along with the children of the first wife.

The record indicates that after the testator's second marriage, and after his children by his first marriage had married and moved away, contact between him and these children was infrequent and in some instances many years would elapse between visits. This may have been due in part to the distance between their places of residence—one child lived in Bristol, Tennessee, another in Oklahoma, while the testator lived in Pattonsville, Virginia, for a while, then in Kingsport, Tennessee, and then in Hawkins County, Tennessee,—and is attributed by the contestants to the allegedly hostile attitude of their stepmother. The contestants' own testimony however, evinces

very litle effort on their part to maintain communication with their father, either by visits or correspondence.

The will does not appear to us to be unnatural. Thirty-one years of fidelity in marriage reasonably can be deemed to merit what this will gives the widow and daughter, particularly in view of the intimate care of the testator that was necessary during the last years of his life. It is not shown that the widow, who was 50 years of age at the time of the trial, has means of livelihood other than the testator's property. It does appear that he had not been supporting any of the children by his first wife, so that both the provision for the dependent widow and their daughter who helped to care for him in his illness, and the lack of provision for the nondependent children, were natural.

 Even if the disposition directed by this will may seem to others to be unjust or unequal, this alone is no ground for an adjudication of incompetency. Farmers Union Bank v. Johnson, 27 Tenn. App. 342, 181 S. W. (2d) 369, 372. Testators generally know far more about the candidates for their bounty than courts and juries later learn through judicial inquiry which, to some extent, must disregard characteristics that reasonably might have seemed important to the testator.

The first assignment of error is that there is no evidence to support the verdict of the jury. This is sustained.

The fourth assignment of error is that the court erred in overruling proponent's motion for a directed verdict, based upon the failure of contestants to introduce evidence of unsoundness or of undue influence. This is sustained.

■ The contestants made no effort to prove undue influence, other than by the implication of the naturally close association between the testator and his wife and daughter by the second marriage. This alone is not material evidence of undue influence.

■ ■ Our holding upon these assignments makes it unnecessary to discuss or rule upon the others; there are fourteen in all. But we do wish to direct attention to the seventh assignment, to the effect that he court erred in limiting counsel to twenty minutes on each side in arguing the case to the jury. More than thirty witnesses testified at the trial, which consumed more than a full day. Upon the completion of the proof, the following took place:

"The Court: How long do you want to argue?

"Mr. Todd: Just a minute.

"Mr. Dodson, Jr.: We want to renew our motion.

"The Court: How long do you want to argue, Mr. Phillips?

"Mr. Phillips: I would say half an hour to forty-five minutes would be sufficient, if your Honor please.

"Mr. Todd: Your Honor, with all the witnesses we had, we would like to have one hour.

"The Court: Twenty minutes on a side.

"Mr. Dodson: We want to save exception, if the Court please, to allowing us only twenty minutes on a side for argument in this case, because it couldn't be covered under any condition in that period of time.

"The Court: Go ahead, your time is going on.

"Thereupon, Counsel for the Contestants and the Proponents argued the case. Counsel for the Contestants argued for a period of 20 minutes; counsel for the Proponents argued for an aggregate period of 25 minutes

and in his closing argument, Mr. Dodson, of counsel for Proponents requested additional time for his argument but before the Court ruled on this request, the Court said that wouldn't be fair to Mr. Phillips and Mr. Dodson then said that Mr. Phillips could have additional time and could close the case and Mr. Dodson stated that he was not afraid of the case anyhow, and then concluded his closing argument.''

The effect of the Court's ruling was to limit each of the two attorneys for the proponents to ten minutes of argument. We believe this to be too short a time for the attorney to discharge his function as an officer of the Court and as the advocate of his client's interests, where the testimony is as lengthy as here. Burson v. Mahoney, 65 Tenn. 304, 307. The proponent's attorneys are not to be deemed to have waived the point by saying that they were ''not afraid of the case anyhow'' and concluding the argument. The pressure of the court upon them to get it over with was too obvious, as well as the importance of not running afoul of the court to the extent that the jury would be adversely influenced.

Reversed and remanded. All costs will be paid by the contestants of the will.

McAmis and Burnett, JJ., concur.