Sandra CLIFTON and husband, Barry Clifton, Plaintiffs/Appellants,

v.

Dr. David BASS and Columbia Area Mental Health Center, Inc., Defendants/Appellees.

Court of Appeals of Tennessee, Western Section, at Nashville.

May 10, 1995.

Application for Permission to Appeal Denied by Supreme Court September 18, 1995.

Douglas S. Johnston, Jr., Nashville, for Plaintiffs/Appellants.

William Landis Turner, Keaton, Turner & Spitzer, Hohenwald, for Defendant/Appellee, Dr. David Bass.

Richard W. Mattson, Levine, Mattson, Orr & Geracioti, Nashville, for Defendant/Appellee, Columbia Area Mental Health Center, Inc.

FARMER, Judge.

This professional malpractice litigation involves an alleged "mishandling" of the therapeutic relationship between Appellant, Sandra Clifton [1] and Appellee, Dr. David Bass

---

1. Appellant, Barry Clifton filed suit for loss of consortium and to recover for the medical and professional expenses incurred by him on his wife's behalf.

(Bass).[2]  It is specifically alleged that Dr. Bass abused the "transference" phenomenon, resulting in the sexual exploitation of Mrs. Clifton.[3]  The appellees denied the allegations and moved the court for summary judgment on the basis that Appellants' claims are barred by the applicable statute of limitations.  Mr. and Mrs. Clifton have appealed from the trial court's grant of the motions, holding "all of [Appellants'] claims"[4] barred by the one year statute of limitations.  We perceive the issue on appeal as whether the trial court erred in its determination.

Sandra Clifton was referred to the appellees for psychotherapy and counseling by her treating physician.  Her counseling sessions with Dr. Bass began in March 1989.  The Cliftons filed the present action on February 6, 1992.

In support of their motions for summary judgment, the appellees submitted the depositions of Mr. and Mrs. Clifton and Dr. Ralph Ivan Barr.  Mrs. Clifton's deposition states that Dr. Bass first deviated from the therapy relationship during a session when he mentioned to her that she was not "ready to go out . . . and have an affair."  He also asked about her thoughts on having an affair.  Subsequent sessions included inquiries as to whether or not Mrs. Clifton had fantasies about other men, including Dr. Bass.  Bass at this time related that he fantasized about her.  On October 13, 1989, during their first sexual encounter, Bass informed her that "he could lose his license for what . . . we're about to do. . . ."  Their last sexual encounter occurred in December 1990.  She informed her husband about the "situation" this same month.

In December 1990, Dr. Bass was preparing to leave his practice at the Center and Mrs. Clifton decided to become a patient of Dr. Barr.  She informed Barr of her sexual involvement with Bass in January 1991.  Dr. Barr explained to her the "options" she had regarding the matter, including filing a complaint with the licensing board.  She does not remember whether he informed her that she could file suit against Bass.  Barr told her that "[Bass] had done wrong and that he thought that [Bass] must be sick."  Mrs. Clifton subsequently wrote three letters to Bass, post-marked in March, June and September of 1991, respectively.  Their last face-to-face encounter occurred during a meeting between the two at his current office on October 22, 1991.[5]

The deposition of Dr. Barr reveals that he is employed as a staff psychiatrist for the Center on a part-time basis.  The remainder of his work is in private practice.  The Center operates 8 clinics.  He treated Mrs. Clifton at the Perry County Clinic in conjunction with Dr. Bass.  He initially interviewed and examined Mrs. Clifton on April 26, 1989.  She was diagnosed with major depressive disorder.  Dr. Barr considered her competent at this time.  He later made an additional diagnosis of dependant personality disorder.

Barr began treating Mrs. Clifton in his private practice on December 21, 1990.  During their January 4, 1991 session, Mrs. Clifton informed him that she had engaged in a sexual relationship with Dr. Bass during his course of treatment.  Barr informed her that such "conduct between a patient and a professional therapist is inappropriate."  Mr. Clifton attended his wife's January 28, 1991 session with Dr. Barr.  During this meeting, Mr. Clifton expressed much anger toward the Center and Dr. Bass.  Barr believed that

---

**2.**  Suit was also filed against Dr. Bass' employer, Columbia Area Mental Health Center, Inc. (Center), an appellee in this action.

**3.**  The complaint states that Dr. Bass' "misconduct" included "showing physical attraction to [her], discussing with [her] aspects of his personal life, accepting gifts and other material from [her] for no therapeutic purpose, creating a dual relationship with [her], and/or entering into a sexual relationship with [her]."

**4.**  The Cliftons additionally sought recovery under Tennessee's Consumer Protection Act and a theory of negligent supervision as to the Center.

**5.**  The record indicates that the meeting resulted from a letter written by Bass to Mr. Clifton stating that his secretary had informed him that Mr. Clifton had requested an appointment for his wife.  The letter indicates that Bass was willing to meet with Mrs. Clifton if thereafter "all communication i.e. phone calls, letters, etc., would cease immediately and forever after the . . . meeting."

both Mr. and Mrs. Clifton thought Bass' behavior was wrong and inappropriate. At this time, Barr discussed options with Mrs. Clifton, including her right to report the matter to the licensing agency and to consult a lawyer. Barr at no time doubted Mrs. Clifton's competency or ability to correctly recall the events. When he was questioned whether she could appreciate the fact that Dr. Bass had "engaged in a relationship with her," Barr responded, "[y]es."

Barr was additionally questioned regarding Mrs. Clifton's ability to understand his comments regarding the various options available to her as a result of Dr. Bass' alleged wrong. The following communication ensued between Barr and counsel:

You told her, I think, in January of '91, that you might have to report this, ... it was inappropriate behavior, that she had legal options of suing him, that she had an option of reporting him to the board. Did she understand what you told her?

A. I repeated those things several times and I think that she understood those words and understood what I was saying, yes, but I do no think that she was—she had not come to a psychologically enough understanding of the inappropriateness of his conduct as a professional.... I do not believe that she had the capability of grasping it all, ... we're talking about someone who was very, very fragile emotionally....

. . . .

Q. Okay, your January 28th note reads "He," referring to Mr. Clifton, "is very angry and made some veil [sic] threats. He and wife asked me to speak with her former therapist and get number for psychological licensing agency that deals with complaints re: professionals' behavior." Now, does that not indicate an understanding of the wrong committed and a thought process going on of taking action about the wrong?

A. It indicates some concern about that.

Barr confirmed that in January 1991, Mrs. Clifton was not "deprived of her reasoning faculties" when the foregoing information was related to her. When asked, "[o]nce you

had told her that in January of 1991, ... would you characterize her as still having no knowledge at all that a wrong had occurred ...?", Barr responded, "[n]o."

The deposition of Mr. Clifton confirms that Barr discussed with him and his wife the various avenues they could pursue regarding Dr. Bass' alleged misconduct on January 28, 1991. Mr. Clifton opined that he was "very angry" at this session and wanted to take action for a wrong that had been done.

In response to the motions for summary judgment, the Cliftons filed the deposition of Dr. Bass and the affidavits of Mrs. Clifton, Drs. Barr and Sieveking and Ms. Billie Greene. Dr. Bass' deposition reveals that he ceased his employment with the Center in December 1990. The affidavit of Dr. Sieveking does not address the statute of limitations issue, but deals merely with the issue of alleged malpractice. The affidavit of Ms. Greene states, as here pertinent:

I am the Director for Therapeutic Services for the Rape and Sexual Abuse Center in Nashville, Tennessee....

.... I am personally familiar with Mrs. Clifton as she attended some group sessions as well as discussing her issue with me individually....

. . . .

In almost every situation because of the intensity of the therapist-patient relationship and the transference phenomenon, the patient-victim is incapable of understanding what has happened to her or that she has been injured as a result for some time after the abusive relationship has ceased and the patient is free from the continued personal interaction with the abuser. This period of time varies according to the circumstances of the patient, but can range from a period of months to many years.

In my opinion when I saw Mrs. Clifton in February, 1992, she was not even then capable of understanding that what had happened to her was psychotherapist malpractice or that she had suffered additional injury as a result.

As herein pertinent, the affidavit of Dr. Barr states:

I ... saw [Mrs. Clifton] on January 4, 1991.... At that time, Mrs. Clifton was completely incapable of understanding that what had happened to her was malpractice or that she had been injured as a result.

I have continued to see Mrs. Clifton on a regular basis since then. Mrs. Clifton remained incapable of understanding that what had happened to her was malpractice or that she had been injured as a result until some time between six and ten months following her January 4, 1991 disclosure to me.

■ In ruling in favor of the appellees, the trial court held that the statute of limitations "commenced to run no later than January 28, 1991."[6] Our standard of review, and that of the trial court, on motions for summary judgment is the same: we must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in their favor and discard all countervailing evidence. *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993). If we determine that a dispute exists as to any material fact or any doubt as to the conclusions to be drawn from that fact, we must deny the motion. *Byrd,* 847 S.W.2d at 211.

■ In this case, the appellees bear the burden of showing that no genuine and material factual issues exist and that they are entitled to a judgment as a matter of law. *See Byrd,* 847 S.W.2d at 211. It is the appellees' contention that summary judgment was properly granted in their favor as the undisputed testimony of Dr. Barr reveals that he informed both Mr. and Mrs. Clifton no later than January 28, 1991 that the actions of Dr. Bass were wrong and subject to both legal and ethical sanctions. They note

that Dr. Barr believed Mrs. Clifton competent and sane at this time.

The Cliftons rely upon the continuing tort doctrine to argue against the running of the statute of limitations. They assert that the tortious conduct of Dr. Bass continued through October. 22, 1991 and that the statute of limitations did not begin to run until approximately 3½ months prior to the filing of the action. It is their position that Dr. Bass was under a duty to inform Dr. Barr of his December 28, 1990[7] and October 22, 1991 meetings with Mrs. Clifton as well as the letters he received from her. They argue that this failure represents a continuation of a breach of his professional duty to appropriately handle the transference phenomenon. The Cliftons also rely in large part upon Dr. Barr's statement that Mrs. Clifton was incapable of understanding the wrong done to her until sometime within 6 to 10 months of her disclosure to him. They assert that discovery was not possible prior to this time due to the "peculiar nature of the transference phenomenon." It is their contention that Mrs. Clifton was a person of "unsound mind" in accordance with T.C.A. § 28–1–106.[8]

In *Housh v. Morris,* 818 S.W.2d 39 (Tenn. App.1991), this court had opportunity to consider whether the continuous tort theory would serve as a means to toll the applicable statute of limitations in light of this jurisdiction's adoption of the discovery rule. The plaintiff in *Housh* filed suit for lack of informed consent and relied upon the decision of *Frazor v. Osborne,* 414 S.W.2d 118 (Tenn. App.1966), to support her argument of a continuing tort. *Housh,* 818 S.W.2d at 43. *Housh* acknowledged *Frazor's* recognition of the continuous tort theory as a means of

6. Pursuant to motion, the court amended its order to deny summary judgment in favor of the appellees. The court ultimately entered an order reinstating the summary judgment for the reasons advanced in its original decision.

7. Bass' deposition makes reference to an incident occurring in the latter part of December 1990 when Mrs. Clifton called him at his new office wanting to see him. A meeting between the two occurred later that day. According to Mrs. Clifton, the meeting occurred on December 28, 1990 during which time she informed him that she loved him.

8. **Persons under disability on accrual of right.**— If the person entitled to commence an action is, at the time the cause of action accrued, either within the age of eighteen (18) years, or of unsound mind, such person, or his representatives and privies, as the case may be, may commence the action, after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceed three (3) years, and in that case within three (3) years from the removal of such disability.

tolling the statute, but refused to apply it, ruling: "[s]ince the holding in *Frazor*, however, our courts have adopted and continuously applied the 'discovery rule.' This doctrine is codified and made applicable to malpractice actions by T.C.A. § 29–26–116. The present action is governed by T.C.A. § 29–26–116." [9]

In a footnote, *Housh* directs our attention to the unreported decision of *Kenton v. United Technology*, No. 71, 1990 WL 32121 (Tenn.App. filed March 26, 1990). *Kenton*, too, addressed the applicability of the continuing tort doctrine in view of the judiciary's subsequent acceptance of the discovery rule. We quote from *Kenton* as follows:

Although the courts in *Frazor*, *[Tennessee Eastman Corp. v. Newman*, 22 Tenn. App. 270, 121 S.W.2d 130 (1938) and *Steiner v. Spencer*, 24 Tenn.App. 389, 145 S.W.2d 547 (1940) ] held that the plaintiffs' causes of action for personal injury accrued upon the date of termination of employment or the professional relationship, we find it noteworthy that all three courts explained that the plaintiffs brought suit within one year of becoming aware of their injury. Subsequent to these cases the "discovery rule" gained recognition and Tennessee courts began adopting that doctrine in personal injury cases.... We believe that the "continuous tort" doctrine must be applied in conjunction with the "discovery rule." Thus, in a case involving a continuing tort, the cause of action accrues at the time the professional relationship or course of treatment is terminated unless, under the "discovery rule," the cause of action is deemed to have accrued at a different point in time. *A plaintiff is not entitled to a new limitations period to begin with the appearance of each new injury or complication.* 54 C.J.S. *Limitations of Actions* Sec. 177 (1987).

*See also Teeters v. Currey*, 518 S.W.2d, 512, 518 (Tenn.1974) (Justice Harbison concurring).

*Kenton*, at *3. (Emphasis added.)

The application of the discovery rule was addressed in *Doe v. Coffee County Bd. of Educ.*, 852 S.W.2d 899 (Tenn.App.1992):

Under our formulation of the discovery rule, the statute of limitations begins to run when the injury occurs or when the plaintiff discovers or should have discovered that he or she has a right of action. *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn.1990); *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d [487] at 491 [ (Tenn.1975) ]. A cause of action is deemed to be discovered when the plaintiff knows that he or she has been injured and who caused the injury. *Foster v. Harris*, 633 S.W.2d 304, 304–05 (Tenn.1982); *Hathaway v. Middle Tenn. Anesthesiology, P.C.*, 724 S.W.2d 355, 359 (Tenn.Ct.App. 1986); *Woods v. Sherwin–Williams Co.*, 666 S.W.2d 77, 79 (Tenn.Ct.App.1983). Discovery is not postponed until the plaintiff becomes fully aware of all the injurious effects of the defendant's conduct. *Chambers v. Dillow*, 713 S.W.2d 896, 898 (Tenn. 1986); *Security Bank & Trust Co. v. Fabricating, Inc.*, 673 S.W.2d 860, 864–65 (Tenn.1983); *Beaman v. Schwartz*, 738 S.W.2d 632, 634 (Tenn.Ct.App.1986).

The discovery rule applies only to matters of fact. *Banton v. Marks*, 623 S.W.2d 113, 116 (Tenn.Ct.App.1981). It tolls the running of the statute of limitations only during the period when the plaintiff has no knowledge at all that a wrong has occurred. *Potts v. Celotex Corp.*, 796 S.W.2d at 680; *Hoffman v. Hospital Affiliates, Inc.*, 652 S.W.2d 341, 344 (Tenn.1983).

*Doe*, 852 S.W.2d at 904.

The effect of the transference phenomenon upon the discovery rule's application was considered by our supreme court in *Roe v. Jefferson*, 875 S.W.2d 653 (Tenn.1994), a case

---

**9.** T.C.A. § 29–26–116 provides:

    (a)(1) The statute of limitations in malpractice actions shall be one (1) year as set forth in § 28–3–104.

    (2) In the event the alleged injury is not discovered within the said one (1) year period, the period of limitation shall be one (1) year from the date of such discovery.

    (3) In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant in which case the action shall be commenced within one (1) year after discovery that the cause of action exists.

factually very similar to the present. In *Roe*, the plaintiff filed a medical malpractice action alleging a violation of the therapist-patient relationship due to sexual misconduct. There, the therapist-patient relationship began in August 1984. The plaintiff alleged that in 1987, the defendant therapist began exhibiting inappropriate behavior involving sexual undertones. A sexual affair began in November 1987 and continued until February 24, 1989. The plaintiff filed suit on February 23, 1990, with the defendant moving for summary judgment on grounds that the one-year statute of limitations had run. *Roe*, 875 S.W.2d at 654–56. The defendant contended that the plaintiff either knew or reasonably should have known of the wrongful conduct and resulting injury no later than October 14, 1988, when she attended a Board of Examiners hearing concerning another psychologist who had been charged with violating certain Board rules in connection with a physician-patient relationship. Prior to the hearing, the plaintiff had been informed by the Board that the defendant had been charged with the same ethical violations. The defendant argued that on this date the plaintiff learned that such conduct was wrong, that it constituted a violation of the Board's rules which could result in the loss of his license and that it could subject him to an action for medical malpractice. The plaintiff contended that due to the transference phenomenon she was incapable of discovering her injury until she had been diagnosed by a mental health professional and informed that she had been abused. *Id.* at 656–57.

▋ In reaching its decision that the statute of limitations had run, *Roe* first expressed its "serious reservations" regarding the reliability of the transference phenomenon. *Id.* at 657. The court then proceeded to discuss two decisions rendered in other jurisdictions pertaining to the issue: *Seymour v. Lofgreen*, 495 P.2d 969 (1972) and *Decker v. Fink*, 47 Md.App. 202, 422 A.2d 389 (1980). The "essence" of these decisions, according to *Roe*, is that once a "plaintiff receives notice from a qualified mental health professional that sex in the context of a therapist-patient relationship is harmful, the plaintiff will be deemed to have discovered the right of action as a matter of law." *Roe*,

875 S.W.2d at 658. The court held the foregoing decisions illustrative of its decision that the plaintiff's failure to file suit within one year of October 14, 1988 was unreasonable as a matter of law. *Id.* at 657. *Roe* determined:

> It is not required that the plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a "right of action"; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.

*Id.* *Roe* found that the plaintiff was possessed of sufficient information to put her on notice that she had sustained injuries as of October 14, 1988, despite the fact that she was not directly informed of such by a mental health professional in the context of a doctor-patient relationship. *Id.* at 658. *Roe* concluded that "no reasonable trier of fact could find that [the plaintiff] was unaware that she had suffered an injury for purposes of the discovery rule." *Id.*

▋ Turning our attention to the instant controversy, we find the undisputed evidence to reveal that Dr. Barr informed both Mr. and Mrs. Clifton that the conduct of Dr. Bass was wrong and subject to both legal and professional sanctions on January 28, 1991. In light of the decision rendered in *Roe*, we conclude that the Cliftons' failure to file suit within one (1) year of this date is unreasonable as a matter of law. We find no merit in their contention that Mrs. Clifton at this time was of unsound mind and incapable of understanding the wrong allegedly done to her. All evidence is to the contrary as even the testimony of Dr. Barr maintains that she was competent at all times during the course of his treatment of her. We agree with the trial court that clearly "transference" does not equate to "incompetence" in law.

Having ruled as such, we are not unmindful of the extremely disturbing and serious aspects of the plaintiffs' allegations. We quote from the learned trial judge who also shares our concerns: "[i]t is difficult to divorce the merits of the case from the issue of

the statute of limitations.... the Court is aware of no authority [, however,] wherein the heinous character of the tort itself is sufficient to toll the statute of limitations." It results that the judgment of the trial court is affirmed. Costs are taxed to Sandra Clifton and husband, Barry Clifton, for which execution may issue if necessary.

TOMLIN, P.J. (W.S.), HIGHERS, J., concur.