Mary N. JACOBS, Plaintiff,

v.

The BAYLOR SCHOOL and Scott Douglass, Defendants.

No. 1:95–CV–428.

United States District Court, E.D. Tennessee.

Dec. 16, 1996.

Stephen T. Greer, Dunlap, TN, for Mary N. Jacobs.

Carter J. Lynch, III, Witt, Gaither & Whitaker, Chattanooga, TN, for The Baylor School.

Hoyt O. Samples, Mitzi Samples, Samples, Jennings & Pineda, Chattanooga, TN, for Scott Douglass.

## MEMORANDUM

COLLIER, District Judge.

Before the Court are the Motion for Summary Judgment filed by Defendant The Baylor School ("Baylor") (Court File No. 15) and the Motion for Summary Judgment filed by Defendant Scott Douglass ("Douglass") (Court File No. 19). Plaintiff Mary N. Jacobs ("Jacobs") filed one Response to both motions (Court File No. 28). Douglass and Baylor filed Replies (Court File Nos. 27 and 31, respectively). Jacobs alleges claims of common law negligence, sexual harassment, assault and battery, and outrageous conduct against Douglass (see Court File No. 1, ¶¶ 8 and 9). Jacobs alleges claims of common law negligence and breach of contract against Baylor (see id. at ¶¶ 12 and 13). For the following reasons, the Court will **GRANT** the motions for summary judgment.

## I. PERTINENT FACTS

### A. General Background

Baylor is a coeducational college preparatory school located in Chattanooga, Tennessee, which educates both day and boarding students. Jacobs entered Baylor as a junior boarding student from Shreveport, Louisiana during the Fall of 1990 when she was sixteen (16) years old. Jacobs did not perform well academically prior to attending Baylor (see,

e.g., Court File No. 21, Ex.B., Austen–Riggs Medical Records at pp. 2–3;[1] Court File No. 21, Ex.C., Menninger Clinic Medical Records at pp. 1–3;[2] Court File No. 27, Ex.A., Jacobs' Interrog.Ans. at p. 2). Jacobs' early poor academic performance, dating from her fifth grade year, prompted her parents to begin sending her for psychiatric evaluation and therapy. From her fifth grade year until she began her junior year at Baylor in the Fall of 1990, she had met with or received some counseling and therapy from at least three different psychiatrists or psychologists (see id.). These evaluations generally characterized her as suffering from varying degrees of anxiety and depression. At the time she entered Baylor, she took anti-depressant medication (see id.).[3]

Except for the English class taught by Douglass, Jacobs did not do well academically during 1990–91, her first year at Baylor (Austen–Riggs at p. 20; Menninger Clinic at p. 3). It is during this academic year Jacobs alleges she had an intimate sexual relationship with Douglass. In the Summer of 1991, Jacobs attended an academic camp to retake a class she failed at Baylor. She passed this and other courses at the academic camp and returned to Baylor for her senior year in the Fall of 1991 but again did not perform well academically (Austen–Riggs at pp. 2–3; Menninger Clinic at pp. 3–4). On March 15, 1992 of her senior year, Jacobs turned eighteen (18) years old. Although she completed the 1991–92 academic year at Baylor, she did not graduate because of her poor academic record.

### B. Evidence of an Unsound Mind

Jacobs underwent a psychiatric evaluation at the Menninger Clinic in early January 1992. The "Outpatient Psychiatric Examination Report," signed by Dr. Ilene B. Spitzer, M.D. and dated January 28, 1992 (Menninger Clinic at p. 13), states *"[t]hough there is no evidence of hallucinations in any sphere, delusions, depersonalization, derealization,*

---

1. The Court will refer to citations of Court File No. 21, Ex.B. as "Austen–Riggs at p. ___."

2. The Court will refer to citations of Court File No. 21, Ex. C. as "Menninger Clinic at p. ___."

3. The record reflects that both of Jacobs' parents and other family members also have been treated for or suffered from depression or anxiety (see Austen–Riggs at pp. 11, 17–18; Menninger Clinic at pp. 4, 8–9, 17–18).

*or thought disorder,* M.'s anxiety and often conviction that the other person is having thoughts about her emotional stability suggests a level of projection that at times borders on paranoia" (*id.* at p. 5) (emphasis added). When discussing her "intellect/cognition," the report states "[t]here was no evidence of tangentiality, circumstantiality, or loosening. *Though there was no evidence of thought disorder or gross deficits in reality testing,* there was a prominent tendency to distort reality" (*id.* at pp. 5–6) (emphasis added).

"M. has a long history of depressed mood, psychomotor retardation, fatigue, impaired concentration, and diminished pleasure to almost all activities consistent with a major depressive disorder. Anxiety also factors in prominently among her symptoms, though she does not suffer from a specific anxiety disorder" (*id.* at p. 10). The Menninger Clinic diagnosed her as having "[m]ajor depression, single episode, unspecified (Chronic type). (Principal Diagnosis) . . . Dysthymia, primary type, early onset. . . . Personality disorder, not otherwise specified with avoidant, dependent, obsessional, and passive/aggressive traits" and recommended antidepressant medication (*id.* at p. 11).

Baylor and Douglass contend Jacobs engaged in several significant events after she turned eighteen years old and left Baylor in the Spring of 1992 (*see* Court File No. 16, pp. 3–4; Court File No. 21, pp. 3–4). First, she worked in a clothing store in Shreveport soon after going home. Second, she got a car in August 1992 and apparently had no restrictions on driving it. Third, for three weeks during November and December 1992, Jacobs participated in a wilderness hiking and camping trip in Idaho. Fourth, by January 1993 she had passed her G.E.D. high school equivalence exam. Fifth, although Jacobs entered Austen–Riggs Center in January 1993, during her time there she participated in various group activities, travelled to Washington, D.C. to attend a gay rights march, and worked part-time in the Austen–Riggs maintenance department and at a local mall to earn spending money. Sixth, the Austen–Riggs Center discharged her in June 1994.

Part of the report describing Jacobs' initial consultation meeting at Austen–Riggs on January 19, 1993 reads:

*There is no evidence of a thought disorder or impaired reality testing.* Her mood was depressed and her affect was constricted and bland. She complained of being obsessional and concrete. Her thought processes were organized and coherent with a tendency toward preoccupation towards details. Thought content was devoid of acknowledge delusions or paranoid ideation although at times she is suspicious. She denied a history of auditory or visual hallucinations, suicidal ideation and intent and homicidal ideation and intent. Her judgement is fair and insight poor. *At the time of consultation Ms. Jacobs impressed me as fully competent to make such decisions as are involved in seeking treatment at a psychiatric hospital.*

(Austen–Riggs at p. 4) (emphasis added); (*see also id.* at p. 1) (noting that Austen–Riggs is "an open hospital and that [Jacobs] would only be offered a consultation with possible admission if she consented"). The Austen–Riggs report filed about a month later on February 22, 1993 diagnosed Jacobs as having "Major Depression, in partial remission . . . Personality Disorder, NOS, with schizoid, narcissistic, passive-aggressive, obsessive-compulsive, and avoidant features" (*id.* at pp. 28–9). At her discharge on June 9, 1994, Austen–Riggs reported her condition as "[i]mproved. She is not overtly depressed, denies suicidal or homicidal ideation, denies substance abuse, shows no thought disorder, and is more introspective" (*id.* at p. 7). The prognosis given for her was "fair, with continued treatment" (*id.*) (noting a prescription for Prozac, 20 mgs. per day).

**C.** *Evidence of the Alleged Sexual Relationship*

In the Fall of 1994, Jacobs began working as an independent contractor for David Tetrault ("Tetrault") in an investigative service agency near her residence in Northampton, Massachusetts. Jacobs claims she confided in Tetrault her concerns and questions about her relationship with Douglass (Court File No. 23, Jacobs Aff. ¶ 7; Court File No. 24, Tetrault Aff. ¶ 3). Jacobs states her conver-

sations with Tetrault prompted her to inquire about her legal rights arising from the relationship with Douglass (Court File No. 23, Jacobs Aff. ¶ 7; Court File No. 24, Tetrault Aff. ¶¶ 3–5). Jacobs claims she did not "understand or realize she had been the victim of and injured by Douglass and Baylor, nor did she know of the existence of the right of action for such wrongs" until several months after leaving the Austen–Riggs Center in June 1994 (Court File No. 28, p. 6; *see also* Court File No. 23, Jacobs Aff. ¶ 7; Court File No. 24, Tetrault Aff. ¶¶ 3–5). Although Jacobs actually filed her Complaint on November 13, 1995 (Court File No. 1), the parties had previously entered a "tolling agreement" that set the filing date as July 10, 1995 (Court File No. 21, Ex. A.).

Baylor and Douglass refute Jacobs' claim with references to the medical records of Jacobs' evaluations by Austen–Riggs and the Menninger Clinic.[4] Baylor and Douglass highlight several places within the medical records which allude to a suspected relationship between Jacobs and Douglass. First, the "Outpatient Psychiatric Examination Report" from the Menninger Clinic covers Jacobs' visit to the Clinic during the period of January 6–10, 1992 (*id.* at p. 1). The report states: "M. became involved in a very close relationship with a male English teacher. Though M. reported that 'we were just good friends,' her questions to siblings about marrying someone older combined with this teacher's dismissal suggested an inappropriate level of intimacy between them" (*id.* at p. 3).

The report also states: "The dean [at Baylor] underscored her serious concerns about a continuing relationship between M. and her 10th grade English teacher, an older, married man. She indicated there was evidence to suggest an ongoing sexual affair between them. She expressed her suspicion that M. wants to come back to the school for that relationship" (*id.* at p. 9). Lastly, "[i]t was also recommended that the nature of M.'s relationship with her former English teacher

be clarified, confronted, and terminated" (*id.* at p. 12).

Second, the "Social Work Examination Report" from the Menninger Clinic, signed by Julie Jones, MSWI and dated January 29, 1992 (*id.* at p. 21), covers January 6, 7, 8, and 10, 1992 (*id.* at p. 14). This report states: "One exception to . . . [Jacobs' poor academic performance] is an English class in which Mary reportedly did very well in. . . . Upon questioning Mr. and Mrs. J. regarding this, they shared that Mary had a 'close' relationship with this English teacher. Mrs. J. stated that she felt Mary had a 'crush' on this teacher. Both parents stated that they felt the relationship was 'strange' because of the amount of time this teacher spent with Mary. Mr. and Mrs. J. reported this teacher resigned due to other problems he was having with Baylor" (*id.* at p. 16). This report also states:

> The issue of Mary's relationship with her English teacher at Baylor was raised by clinicians during this exam (the parents did not initiate discussion of this issue). As noted earlier in this report, Mrs. J. described the relationship as 'strange.' Upon careful questioning, both with and without Mary present, the parents stated that they did not believe (or suspect) that a sexual relationship occurred. Mary herself denied any sexual contact with the teacher. Carleen Franz, Ph.D., psychoeducational consultant for this exam, spoke by phone with Nelson Sudderth, Academic Dean for Baylor School, regarding the school's impression of the relationship. School officials noted that, while the teacher was asked to leave his position, this request was not based on his contact with Mary. At the time of this report, Dr. Franz was in the process of seeking further clarification as to the school's concerns; pending this clarification, additional action will be taken if necessary.

(*id.* at p. 21).

Third, the "Psychological Test Report" from the Menninger Clinic, signed by Milfred

---

4. The Court notes Jacobs does not dispute the validity of the various findings of or statements made within the two sets of medical records; rather, she contests the interpretation given

those findings by Baylor and Douglass (*see* Court File No. 28, p. 5; Court File No. 16, p. 2 n. 2 (noting the requests for admission)).

Dale, Ph.D. and dated February 6, 1992 (*id.* at p. 25), covers January 7 and 9, 1992 (*id.* at p. 22). This report states: "In addition, there are several indications of a need for a female therapist[,] including Mary's need to identify with an adult female authority figure, her own developing needs regarding sexuality, and the possibility that she has been inappropriately involved with a male teacher in the past" (*id.* at p. 24).

Fourth, the "Admission/Consultation Information" report from the Austen–Riggs Center is signed by Jonathan R. Aronoff, Ph.D. and dated January 20, 1993. It reads: "[Jacobs] transferred to Baylor where she became depressed and was treated for the first time with antidepressants. Baylor turned out to be another negative experience for Mary. She developed a close relationship with an English teacher and her grades improved but the relationship became suspect when it appeared that he was overly involved with her" (Austen–Riggs at p. 2). Fifth, another Austen–Riggs report, dated February 22, 1993, states: "There was ... suspicion that she had some sort of improper relationship with her English teacher, and for this reason he was dismissed at the end of that year" (*id.* at p. 20). Lastly, within a "monthly progress note," dated March 11, 1993 and signed by John P. Muller, Ph.D., appears the following: "Issues being addressed in individual psychotherapy: She remains highly ambivalent about exploring her unexpressed thoughts and feelings but has openly spoken about her ambivalence regarding the end of a two-year relationship" (*id.* at p. 32).

## II. *STANDARD OF REVIEW*

Under *Fed.R.Civ.P.* 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show conclusively no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must view the facts and all infer- ences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Oakland Gin Co., Inc. v. Marlow,* 44 F.3d 426, 429 (6th Cir.1995); *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 404–06 (6th Cir.1992) (holding courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251– 52, 106 S.Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lan-*

*sing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411.

## III. *ANALYSIS*

The parties agree Tennessee law controls the outcome of this diversity action. *See Macon v. ITT Continental Baking Co. Inc.,* 779 F.2d 1166, 1172 n. 5 (6th Cir.1985); *Smith v. Grumman–Olsen Corp.,* 913 F.Supp. 1077, 1084 (E.D.Tenn.1995) (Collier, J.). Baylor and Douglass argue that Jacobs' entire case is barred by the one year statute of limitations applicable to personal injuries. *See* Tenn.Code Ann. § 28–3–104(a)(1). However, Tenn.Code Ann. § 28–1–106 provides for suspension of the one year personal injury statute of limitations for certain disabilities. Section 28–1–106 reads:

> **Persons under disability on accrual of right.**—If the person entitled to commence an action is, at the time the cause of action accrued, either within the age of eighteen (18) years, or of unsound mind, such person, or his representatives and privies, as the case may be, may commence the action, after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceed three (3) years, and in that case within three (3) years from the removal of such disability.

This case requires the Court to determine the reach of this tolling statute and, in particular, to explore further the meaning of pleading an "unsound mind." *See Grumman–Olsen Corp.,* 913 F.Supp. at 1084–86 (reviewing the plaintiff's claim of an unsound mind).

█ A brief review of the purpose of a statute of limitations is helpful. Statutes of limitations help to "ensure fairness to the defendant by preventing undue delay in bringing suits on claims[ ] and by preserving evidence so that facts are not obscured by the lapse of time or the defective memory or death of a witness." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818, 820 (Tenn.1994) (citations omitted). They "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Robinson v. Central Brass Mfg. Co.,* 987 F.2d 1235, 1243 (6th

Cir.1993) (quoting *Burnett v. New York Central R.R.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965)); *see also Vason v. Nickey,* 438 F.2d 242, 244 (6th Cir.1971).

> Statutes of limitation have been part of the law of every civilized nation from time immemorial.... Such statutes, having the effect of denying any judicial remedy for the enforcement of an otherwise valid claim, are justified on grounds of policy and ... 'designed to protect the citizens from stale and vexatious claims and to make an end to the possibility of litigation after the lapse of a reasonable time.'

*Hargraves v. Brackett Stripping Machine Co.,* 317 F.Supp. 676, 682 (E.D.Tn.1970) (citing *Guaranty Trust Co. of New York v. United States,* 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938)). Notably, the primary purpose of statutes of limitation is fairness to the defendant. *Monaghan v. SZS 33 Assocs., L.P.,* 827 F.Supp. 233, 241 (S.D.N.Y. 1993).

█ Legislatures take into account the possible harshness of a perfunctory application of a statute of limitations by enacting tolling statutes. Tennessee courts recognize Section 28–1–106, notwithstanding the relief it potentially provides, "should not be given an expansive interpretation beyond its plain meaning." *Pigg v. Barge, Waggoner, Sumner and Cannon and Jabco, Inc.,* 1988 WL 92523, at p. *2 (Tenn.Ct.App. Sept. 9, 1988) (applying Section 28–1–106); *see also Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899, 905 (Tenn.Ct.App.1992) (noting "any further liberalization of statute is properly a legislative prerogative"). The purpose of tolling statutes based upon a personal disability is "to afford such person an additional amount of time to sue ... and exceptions to a limitations statute in favor of persons under disability should be strictly construed and never extended beyond their plain import...." *Cohen v. Pearl River Union Free School Dist.,* 70 A.D.2d 94, 99–100, 419 N.Y.S.2d 998, 1001 (2d Dep't.1979) (citations omitted), *rev'd on other grounds,* 51 N.Y.2d 256, 434 N.Y.S.2d 138, 414 N.E.2d 639 (1980).

█ As a general rule, tolling statutes based on disabilities only apply if the disabili-

ty existed at the time the cause of action accrued. *Foster v. Allbright,* 631 S.W.2d 147, 150 (Tenn.Ct.App.1982).

> The general rule, which is subject to some exceptions, is that when a right of action has accrued, and there are parties competent to sue and be sued, limitations begin to run and will continue to do so notwithstanding any subsequent disability; the provisions suspending the operation of limitations, or extending the period, in favor of persons under disability are confined to disabilities existing at the time the cause of action accrues to such person.

54 C.J.S., *Limitation of Actions* § 107. In this case, Jacobs turned eighteen (18) years old on March 15, 1992. Section 28–1–106 gave her one additional year within which to file suit because of her minority status at the time the cause of action accrued. That date was March 15, 1993. Jacobs filed this action on July 10, 1995. Given the passage of over two years from the date of Jacobs' nineteenth birthday and the filing of this action, Jacobs does not benefit from Section 28–1–106 because of her minority status at the time the cause of action accrued.

However, the Court must also analyze whether she benefits from the "unsound mind" provision of Section 28–1–106.[5] Jacobs alleges she did not become aware of a possible cause of action until a few months after her discharge from the Austen–Riggs Center in June 1994. By arguing she was unaware of a possible cause of action until the Summer of 1994, Jacobs invokes Tennessee's discovery rule:

> Under [Tennessee's] formulation of the discovery rule, the statute of limitations begins to run when the injury occurs or

when the plaintiff discovers or should have discovered that he or she has a right of action. *Potts v. Celotex Corp.,* 796 S.W.2d 678, 680 (Tenn.1990; *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d [487,] 491 [ (Tenn.1975) ]. A cause of action is deemed to be discovered when the plaintiff knows that he or she has been injured and who caused the injury. *Foster v. Harris,* 633 S.W.2d 304, 304–05 (Tenn.1982); *Hathaway v. Middle Tenn. Anesthesiology, P.C.,* 724 S.W.2d 355, 359 (Tenn.Ct.App. 1986); *Woods v. Sherwin–Williams Co.,* 666 S.W.2d 77, 79 (Tenn.Ct.App.1983). Discovery is not postponed until the plaintiff becomes fully aware of all the injurious effects of the defendant's conduct. *Chambers v. Dillow,* 713 S.W.2d 896, 898 (Tenn. 1986); *Security Bank & Trust Co. v. Fabricating, Inc.,* 673 S.W.2d 860, 864–65 (Tenn.1983); *Beaman v. Schwartz,* 738 S.W.2d 632, 634 (Tenn.Ct.App.1986).

> The discovery rule applies only to matters of fact. *Banton v. Marks,* 623 S.W.2d 113, 116 (Tenn.Ct.App.1981). It tolls the running of the statute of limitations only during the period when the plaintiff has no knowledge at all that a wrong occurred. *Potts v. Celotex Corp.,* 796 S.W.2d at 680; *Hoffman v. Hospital Affiliates, Inc.,* 652 S.W.2d 341, 344 (Tenn.1983).

*Doe,* 852 S.W.2d at 904; *see also Clifton v. Bass,* 908 S.W.2d 205, 209 (Tenn.Ct.App. 1995); *Grumman–Olsen Corp.,* 913 F.Supp. at 1084–85; *Dean Witter Reynolds, Inc. v. McCoy,* 853 F.Supp. 1023, 1036 (E.D.Tenn. 1994) (Edgar, J.).

"The mere ignorance and the failure of a plaintiff to discover the existence of a cause of action is not sufficient to toll the running of the limitations period." *Burks v. Stein,*

---

**5.** Douglass asserts Jacobs never properly pleaded in her Complaint the unsound mind provision of Section 28–1–106: "[T]he Plaintiff has failed to present *any* proof whatsoever to support the unalleged implied assertion that the Plaintiff was of 'unsound mind' at all relevant times" (Court File No. 27, p. 1); "[T]he Plaintiff has never pled or even apparently alleged that Mary Jacobs was ever of 'unsound mind' " (*id.* at pp. 10–11).

Review of the record reveals Jacobs never specifically claims she was of unsound mind. While the failure to do so may not strengthen her case, neither does failure to do so automatically preclude benefit of the tolling statute. After all,

Jacobs does refer to case authority addressing the unsound mind provision. Douglass' assertion, though, does not lack significance. The Court notes that determining whether one is of "unsound mind," as Section 28–1–106 specifically requires, may involve distinguishing between insanity, vulnerability, depression, being emotionally and mentally unstable, and being of unsound mind. Specifically alleging and then strenuously advocating the differences between and relationships among these terms of art would certainly benefit the Court's understanding of the issues in this case.

No. 105682–2, 1996 WL 614208, at p. *2 (Tenn.Ct.App. Oct. 25, 1996).

> It is not required that a plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a 'right of action'; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct.

*Carvell v. Bottoms*, 900 S.W.2d 23, 29 (Tenn. 1995) (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn.1994)); *see also Burks*, 1996 WL 614208, at p. *3.

■ This case requires the Court to determine whether Jacobs was of unsound mind such that the statute of limitations was tolled until she discovered her cause of action. Jacobs bears the burden of proving she was of unsound mind during the entire time necessary to toll the statute. *Grumman–Olsen Corp.*, 913 F.Supp. at 1084 (citing *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn.Ct.App. 1978)). Tennessee courts defined having an unsound mind as follows:

> ... While the statute itself does not define the term 'unsound mind,' an early case construing the statute's predecessor applied it to an elderly woman found to be 'incapable of attending to any business, or of taking care of herself.' *Porter v. Porter*, 22 Tenn. (3 Hum.) 586, 589 (1842).
>
> The *Porter v. Porter* formulation is generally consistent with the common understanding of 'unsound mind,' *Sheats v. Tri–Cities' Hosp. Auth.*, 167 Ga.App. 122, 306 S.E.2d 75, 76 (1983); 56 C.J.S. *Mental Health* § 2, at 500 (1992); 54 C.J.S. *Limitation of Actions* § 117 (1987); 44 C.J.S. *Insane Persons* § 2, at 46 (1945), and is consistent with the decisions of other jurisdictions applying similar statutes to cases involving child sexual abuse.

*Doe*, 852 S.W.2d at 905 (some citations omitted); *see also Grumman–Olsen Corp.*, 913 F.Supp. at 1085.

The Court also finds helpful Tennessee cases discussing soundness of mind when considering testamentary capacity. In *Rogers v. Hickam*, 30 Tenn.App. 504, 208 S.W.2d 34, 38 (1947), the court observed that one is not rendered incapable, *i.e.*, of unsound mind, to make "a will by mere physical weakness or diseases, old age, eccentricities, blunt perceptions, weakening judgment, failing mind or memory, or addiction to the use of intoxicating liquors." *See also Oakley v. Stewart*, 936 S.W.2d 259, 260 (Tenn.Ct.App.1996) (same). Cases from other states have similarly construed the term. See *Lawson v. Glover*, 957 F.2d 801 (11th Cir.1987) (construing Georgia law); *Tri–Cities Hospital v. Sheats*, 156 Ga. App. 28, 273 S.E.2d 903 (1980); *Boudreau v. Landry*, 404 Mass. 528, 536 N.E.2d 339 (1989).

■ Whether a person is of unsound mind, then, focuses on two components. First, is the person alleged to be of unsound mind incapable of attending to *any* business? Second, is the person alleged to be of unsound mind incapable of taking care of herself? This case asks what evidence supports and contradicts the notion Jacobs was of "unsound mind" for a sufficient period to toll the statute of limitations. That is, what evidence is there to support or contradict the allegation Jacobs was incapable of attending to any business or of taking care of herself? Moreover, application of the discovery rule requires the Court to determine whether Jacobs was of unsound mind such that she could not reasonably have been expected to discover the facts putting her on notice of a possible cause of action against Baylor and Douglass.

The obvious place in this case to look for evidence supporting Jacobs' claim of having an unsound mind is the medical records. Baylor and Douglass offer the affidavit of a licensed physician with a specialty in psychiatry to interpret the medical records (Court File No. 17, Aff. of Ben Bursten, M.D.). Dr. Ben Bursten ("Dr. Bursten") opines, "to a reasonable degree of medical certainty, ... Jacobs was of sound mind at the time of her eighteenth birthday ... and has continued to be of sound mind" (*id.* at p. 1). He also believes to a reasonable degree of medical certainty that Jacobs did not repress her memories of the alleged relationship with Douglass (*id.*). Specifically, Dr. Bursten states the medical records demonstrate Ja-

cobs "did not have any type of thought disorder, showed no suicidal thoughts or intentions, and was capable of taking care of herself and attending to her business" (*id.*).

■ Jacobs argues "these [medical] records graphically depict a young, adolescent female who was psychologically and emotionally unstable when she entered and enrolled at Baylor in the Fall of 1990, and who remained emotionally and mentally unstable for years thereafter up to and including the Summer of 1994.... These medical records clearly and fully support the allegations of the Complaint that Jacobs was 'vulnerable' at the time of her tenure at Baylor School in the 1990–91 school year" (Court File No. 28, pp. 5–6). Other than the medical records themselves, Jacobs does not provide independent evidence that the medical records show she was of unsound mind.[6] Jacobs also contends only in the Summer of 1994 "did [she] know, understand or realize she had been the victim of and injured by the conduct of Douglass and Baylor" (*Id.* at p. 6). In support of this last contention, Jacobs offers her affidavit and that of Tetrault.

■ Unsoundness of mind is a question of fact. Before deciding whether a jury question exists, though, the Court must first determine if there is enough evidence of Jacobs' inability to manage her own affairs to create a genuine issue of material fact. *See Grumman–Olsen Corp.*, 913 F.Supp. at 1085–86 (comparing the evidence). Without question the Court agrees Jacobs has suffered from depression and anxiety for a good part of her life. The record also reflects that Jacobs took prescribed medication for her condition.

■ Two important considerations nonetheless persuade the Court to find Jacobs does not benefit from the tolling statute because of an alleged unsound mind. First,

case authority indicates she must have been incapable of managing her affairs. *See Doe*, 852 S.W.2d at 905 (noting the measure is "incapable of attending to their business"); *Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir.1996) (noting the "traditional rule that a mental illness tolls a statute of limitations only if the illness *in fact* prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them"); *Phillips v. Sugrue*, 800 F.Supp. 789, 791 (E.D.Ark.1992) (noting "when a person ... is incapable of managing his or her personal affairs, that individual may be regarded or classified as incompetent or 'insane' "). While the record indicates Jacobs suffered from depression and anxiety, the record does not indicate her depression and anxiety completely debilitated her. In fact, much evidence exists she took care of herself and made her own decisions: She passed her G.E.D. high school equivalency exam, went on a three weeks camping/hiking trip, travelled about in her own car, took a trip to Washington, D.C., consented to enter the Austen–Riggs Center, came and went to the Center as she pleased, and worked part-time jobs.

Second, although Jacobs contends she only became aware of the possible cause of action in July or August 1994, that contention is insufficient. "The mere ignorance and the failure of a plaintiff to discover the existence of a cause of action is not sufficient to toll the running of the limitations period." *Burks*, 1996 WL 614208, at p. *2.

> It is not required that a plaintiff actually know that the injury constitutes a breach of the appropriate legal standard in order to discover that he has a 'right of action'; the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on

---

**6.** This statement should not be misunderstood. Tennessee courts have long recognized that expert testimony is necessary when the subject in question requires the trier of fact to have the aid of knowledge and experience typically not possessed by ordinary witnesses. *See Lawrence County Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn.1981); *Casone v. State*, 193 Tenn. 303, 246 S.W.2d 22, 26 (Tenn.1952). Certainly, within the medical records already provided are numerous

references to Jacobs' state of mind from mental health professionals. Defendants, though, offered an interpretation of this evidence that portrays Jacobs of sound mind. By pointing out the absence of an independent, expert opinion, which interprets the medical records and clearly and precisely states that Jacobs was of unsound mind during the relevant period, the Court wants to underscore the analysis given to the dispositive issue.

notice that he has suffered an injury as a result of wrongful conduct.

*Carvell,* 900 S.W.2d at 29 (quoting *Roe,* 875 S.W.2d at 657); *see also Burks,* 1996 WL 614208, at p. *3.

The medical records demonstrate that nearly everyone involved in the case—her parents, Baylor, and her psychiatrists, psychologists, and counselors—*at the very least suspected* Jacobs had a sexual relationship with Douglass while at Baylor. Significantly, it must have been Jacobs who provided the information in the medical reports. *See Clifton,* 908 S.W.2d at 209 (noting that for the discovery rule to apply the plaintiff must have "no knowledge at all that a wrong occurred"); *Doe,* 852 S.W.2d at 904 (same); *Grumman–Olsen Corp.,* 913 F.Supp. at 1084–85 (same); *Dean Witter Reynolds, Inc.,* 853 F.Supp. at 1036 (same). Given the extent to which Jacobs related facts sufficient for her psychiatrists, psychologists, and counselors to suspect that she had a sexual relationship with Douglass, the Court does not find Jacobs repressed her memory of this alleged relationship. *See Hunter v. Brown,* No. 03A01–9504–CV–00127, 1996 WL 57944, at p. *4 (Tenn.Ct.App. Feb. 13, 1996) (noting "we decline to adopt the discovery rule in [repressed memory] cases.... [W]e are unwilling to put the determination when the statute of limitations accrues solely in the hands of a plaintiff"); *Doe,* 852 S.W.2d at 905 (noting the plaintiffs "never totally repressed their memories").

Jacobs did not meet her burden under the summary judgment standard. Her depression and anxiety did not render her of unsound mind. Moreover, Baylor and Douglas undoubtedly demonstrate Jacobs was aware of facts sufficient to put a reasonable person on notice she suffered an injury as a result of alleged wrongful conduct. Accordingly, the Court finds Jacobs cannot maintain a claim in tort against Baylor or Douglass because such claims are barred by the one-year statute of limitations and not tolled by the tolling statute.

The Court's analysis does not end there. Jacobs also alleges that Baylor breached either an express or an implied contract to provide her with a safe environment within which to live and attend school (*see* Court File No. 1, ¶¶ 13 and 14; Court File No. 28, p. 15). If Jacobs' Complaint includes a breach of contract claim, the applicable statute of limitations may be up to six years. *See* Tenn.Code Ann. § 28–3–109(a)(3). Baylor argues the Court must look to the gravamen of the complaint to determine the real purpose and damages of the claim, which then determine the appropriate statute of limitations (Court File No. 31, pp. 1–2).

In Tennessee, "the gravamen of an action, rather than its designation as one in tort or contract, determines the applicable statute of limitations." *Yater v. Wachovia Bank of Georgia, N.A.,* 861 S.W.2d 369, 372 (Tenn.Ct.App.1993); *see also Headrick v. Union Carbide Corp.,* 825 S.W.2d 424, 424 (Tenn.Ct.App.1991); *Pera v. Kroger Co.,* 674 S.W.2d 715, 719 (Tenn.1984); *Bland v. Smith,* 197 Tenn. 683, 686, 277 S.W.2d 377, 379 (Tenn.1955). Courts have described this as looking at substance, or subject matter, over form. *Carney v. Smith,* 222 Tenn. 472, 477, 437 S.W.2d 246, 248 (Tenn.1969); *Hoge v. Roy H. Park Broadcasting of Tennessee,* 673 S.W.2d 157, 160 (Tenn.Ct.App.1984). The primary criterion used to ascertain the gravamen, or substance, of a complaint is the kind of damages alleged. *Bland,* 197 Tenn. at 686, 277 S.W.2d at 379; *Prescott v. Adams,* 627 S.W.2d 134, 137 (Tenn.Ct.App. 1981); *Harvest Corp. v. Ernst & Whinney,* 610 S.W.2d 727, 729 (Tenn.Ct.App.1980); *Electric Power Bd. of Chattanooga v. Monsanto Co.,* 879 F.2d 1368, 1375 (6th Cir.1989).

The statute of limitations for a contract claim may be six years, three years, or one year. *See Pera,* 674 S.W.2d at 719–20 (discussing cases). The statute of limitations is six years "only ... in cases where the whole basis of recovery is sought on contract and no element of personal injuries is involved." *Bland,* 197 Tenn. at 686, 277 S.W.2d at 379. The limitations period is three years when the contract claim involves damages to property. *Prescott,* 627 S.W.2d at 137. The limitations period is one year when the case rests upon claims such as mental anguish, anxiety, humiliation, embarrassment, and damage to reputation. *See*

*Pera,* 674 S.W.2d at 719; *Yater,* 861 S.W.2d at 372; *Whitsey v. Williamson County Bank,* 700 S.W.2d 562, 565 (Tenn.Ct.App.1985) (noting the one year limitations period of "actions for mental anguish, regardless of the nature of the wrong which produced the injury").

██ Jacobs' specific allegations of common law negligence and breach of contract are important to determining which statute of limitations applies to Jacobs' putative contract claim. Jacobs alleges a tort claim against Baylor for the following:

(a) Failing to properly supervise Douglass as one of its teachers;

(b) Failing to take reasonable and ordinary steps and actions to prevent and/or terminate the improper relationship that developed between Plaintiff and Douglass when Baylor knew or should have known of the beginning and/or existence of such relationship;

(c) Failing to exercise reasonable care in providing for the safety of the Plaintiff as a teenage, high school boarding student;

(d) *Failing to provide to the Plaintiff a reasonably safe and sound environment within which to live and attend school as a high school student;*

(e) Failing to exercise reasonable care in the hiring and/or retaining of a teacher who was or became incompetent when Baylor had notice of his incompetence.

(Court File No. 1, ¶ 12) (emphasis added).

In pertinent part, the Complaint addresses the putative breach of contract claim as follows:

At the time that the Plaintiff enrolled in Baylor in the Fall of 1990, *Baylor agreed expressly or impliedly, to provide to the Plaintiff a reasonably safe and sound environment within which to live and attend school.* As a result of Baylor's conduct as described in this Complaint, *Baylor breached that contractual duty, and such breach of contract constitutes a proximate cause of the injuries and damages* sustained by the Plaintiff as described herein.

As a direct and proximate result of the actions of Douglass and Baylor as described in this Complaint, *the Plaintiff sustained and suffered mental, emotional and psychological trauma* which substantially contributed to the deterioration of her already vulnerable condition. . . .

. * * * * * *

As a result of the conduct of Douglass and Baylor as described in this Complaint, *the Plaintiff has suffered and will continue to suffer severe, substantial and permanent mental, emotional and psychological injuries,* has incurred and will continue to incur medical expenses, and *has incurred and will continue to incur pain and suffering,* a loss of earnings and diminished earning capacity and *loss of enjoyment of life.*

(*id.* at ¶¶ 13, 14, and 15) (emphasis added). Jacobs only seeks compensatory damages and does not allege damage to property.

The gravamen of the Complaint centers on the mental and emotional harm suffered by Jacobs because of the Defendants' actions: "As a direct and proximate result of the actions of Douglass and Baylor as described in this Complaint, *the Plaintiff sustained and suffered mental, emotional and psychological trauma* which substantially contributed to the deterioration of her already vulnerable condition" (*id.* at ¶ 14) (emphasis added). The loss of enjoyment of life and the pain and suffering claims are both of a personal injury nature. There is a conspicuous absence of damages, such as a claim for lost tuition, one would normally associate with a breach of contract claim in this context.[7] While there is a claim for medical expenses, this claim is closely intertwined with the mental, emotional, and psychological injuries damages claim. Jacobs also makes a loss of earnings and diminished earning capacity claims, but it is unclear on what grounds she rests these claims.

---

7. The Court does not dispositively reach the issue of whether there is a cause of action sounding in contract under the circumstances of this case. Neither party cited Tennessee case authority supporting that proposition. However, only for purposes of this Memorandum and the statute of limitations argument, the Court will presume that such a cause of action exists.

This case implicates the policy and purpose of a statute of limitations. As discussed above, one of the main concerns addressed by a statute of limitations is the preservation of reliable memories of pertinent allegations and facts. A shorter statute of limitations implicitly recognizes this policy more than a longer statute of limitations, which acknowledges the existence of less fleeting sources of facts such as documentation. Jacobs' focus is on her vulnerability and the damage allegedly done to her mental and emotional well-being. These allegations rest upon memories, not upon more reliable sources of information such as documentation. It is appropriate that the putative contract claim in this case is subject to application of a one-year statute of limitations.

## IV. CONCLUSION

The Court finds Jacobs cannot meet her burden under the summary judgment standard for either the tort or putative contract claims. Accordingly, the Court will **GRANT** the motions for summary judgment (Court File Nos. 15 and 19).

An Order will enter.

### ORDER

In accordance with the accompanying Memorandum, the Court **GRANTS** the Motion for Summary Judgment filed by Defendat The Baylor School (Court File No. 15) and **GRANTS** the Motion for Summary Judgment filed by Defendant Scott Douglass (Court File No. 19).

**SO ORDERED.**